```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION
```

**THE SCOTTS COMPANY LLC,**

        Plaintiff,

  vs.                                 Civil Action 2:06-CV-899
                                      Judge Graham
                                      Magistrate Judge King

**LIBERTY MUTUAL INSURANCE COMPANY,**

        Defendant.

## OPINION AND ORDER

This is a diversity action in which plaintiff asserts claims of breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, bad faith, fraud, as well as recision in connection with its execution of a settlement agreement with defendant relating to environmental lawsuits instituted against plaintiff. Plaintiff specifically alleges that the settlement agreement, intended as a complete policy buyout in connection with policies assertedly purchased by plaintiff from defendant in the 1950's and 1960's, was induced by defendant's fraud.

A recurring feature of this litigation has been the apparent rancor between counsel for the parties, if not between the parties themselves. In yet another manifestation of that discord, this matter is now before the Court on defendant's motion for the imposition of sanctions pursuant to F.R. Civ. P. 30 and 37, Doc. No. 130, and on plaintiff's cross-motion for a protective order, Doc. No. 141.

The motions relate to the August 2007 deposition of Joyce Armstrong who, as plaintiff's director of risk management, was charged with primary responsibility in plaintiff's dealings with defendant that culminated in the execution of the settlement agreement at issue in this

case.[1]  Defendant takes the position that its ability to meaningfully depose Ms. Armstrong was frustrated by both the deponent and plaintiff's counsel.  Defendant asks that either Ms. Armstrong be precluded from testifying at trial in this matter or that plaintiff produce Ms. Armstrong for a deposition *de novo* before a special master and at plaintiff's expense.  Defendant also seeks an award of monetary sanctions.  Plaintiff's cross-motion for a protective order asks that Ms. Armstrong's deposition be completed in the presence of a special master with the expenses to be shared equally by the parties.  Plaintiff concedes at least some deficiencies in Ms. Armstrong's deposition, but contends that "[t]he main problem with the deposition was the questioning, not the answers. Liberty Mutual's counsel repeatedly sought to belittle, badger and intimidate Ms. Armstrong by making inappropriate comments and repeated oral 'motions to strike' -- even when it was clear that the witness had tried her best to answer the question."  *Plaintiff's Memorandum in Opposition to Motion for Sanctions and in Support of Cross-Motion for Protective Order,* at p.10, Doc. No. 142.

   The Court has reviewed both volumes of the transcript of the deposition of Joyce Armstrong.  *Exhibit* attached to *Motion for Sanctions,* Doc. No. 130 ["*Armstrong Depo. Tr.*"].  Plaintiff's characterization of the deficiencies in the deponent's testimony ("Ms. Armstrong no doubt made some mistakes and failed to answer some of the questions as precisely or as more experienced deponents could have done, ..., *Memorandum in Opposition to Motion for Sanctions and in Support of Cross-Motion for Protective Order,* at p.9, Doc. No. 142) fails to accurately

---

[1] Ms. Armstrong was deposed both in her individual capacity and as plaintiff's Rule 30(b)(6) designee. With the agreement of the parties, the deposition had been scheduled to last fourteen (14) hours.  The parties agree that the deposition was not completed.

reflect the deponent's persistent and unwarranted attempts to avoid direct response to unambiguous questioning.  Although instances of what appears to be deliberate evasiveness are too numerous to recount, the following exchange is but a sample of much of the deponent's testimony:

> Q. Do you know whether or not there were pesticides that were manufactured by Scotts at the Marysville site prior to the settlement with Liberty?
>
> A. Primarily that site manufactured fertilizer.
>
> Q. Were there, however, pesticides that were linked to the Marysville landfill that you were aware of back at the time you were dealing with Liberty?
>
> A. I believe there were chemicals, a variety of chemicals, linked to the landfills at the Marysville site.
>
> Q. So if you could, turn to page 004569.
>
> A. [Witness complies with request.]
>
> Q. There's a slide there in the middle --
>
> A. Uh-huh.
>
> Q. -- that says contaminants linked to Marysville landfills.  Do you see that?
>
> A. Yes, I do.
>
> Q. And it lists the contaminants as pesticides, including Atrazine, Chlordane, Diazinon, Pendimethalin, Cyanizine, and something called Pentachloronitrobenzenen.  Do you see that?
>
> A. Yes, I do.
>
> Q. And you knew that at the time you were dealing with Liberty, that the Marysville landfills had pesticides related to these contaminants; is that right?
>
> A. These are components of products of Scotts.
>
> Q. So the answer is yes?
>
> A. These are components of the products of Scotts.

>      Q.   And you knew that, correct, when you were meeting with Liberty?
>
>      A.   Could you repeat that whole question?
>
>      Q.   Sure.  You knew that Scotts was alleged to have contaminants linked to Marys -- to the Marysville landfills with pesticides including all those chemicals that I just listed that are on the slide here?
>
>      A.   I knew that these were contaminants linked to the Marysville landfill that included these pesticide ingredients, yes.

*Armstrong Depo. Tr.,* at pp. 49-51.  In another particularly egregious exchange, the deponent was asked whether, as of the time that she became plaintiff's risk manager in November 1997, plaintiff had made any pollution related claims to defendant under policies issued by defendant to plaintiff[2] in the 1950's and 1960's.  *See Armstrong Depo. Tr.,* at pp. 62 - 78.  Although one would expect that the question could have been answered by a simple "yes," "no," or "I don't know," defense counsel finally abandoned the topic more than 15 pages later without ever having received such a response from the witness.  *Armstrong Depo. Tr.,* at p.78. In many instances, the problem was aggravated by plaintiff's counsel's objections that the question had been "asked and answered;" the question had certainly been asked, but it was often not answered.

    Plaintiff argues that it was defense counsel who acted improperly in his conduct of the deposition, belittling the deponent and improperly moving to strike her testimony without justification. It is true that the transcript indicates that defense counsel grew impatient with the deponent; it is also apparent that his impatience was a response

---

[2]Defense counsel made it quite clear that he was not referring to policies that may have provided coverage to plaintiff but which were issued to ITT, which owned plaintiff for a period of time.  *See, e.g., Armstrong Depo. Tr.*, at pp. 63 – 65.

4

to the deponent's persistent refusal to respond directly to his questions. The Court notes with interest, in this regard, that the instances complained of by plaintiff, *Plaintiff's Memorandum in Opposition to Motion for Sanctions and in Support of Cross-Motion for Protective Order,* at p.17, occurred well into the deposition.

Although the Court condemns, in the strongest possible terms, the tenor and tactics manifested during Ms. Armstrong's August 2007 deposition, the Court declines to prohibit her testimony relating to the merits of this action. Ms. Armstrong is a critical witness. Moreover, the deficiencies in her deposition may yet be remedied.

Both parties agree that the deposition of Ms. Armstrong has not been completed. Defendant asks that the deponent be required to submit to an entirely new deposition. Plaintiff suggests that the deposition be continued for only three more hours and that defendant be limited to only specified areas of inquiry.

Considering the pervasiveness of Ms. Armstrong's failure to provide direct and unambiguous answers to direct and unambiguous questions, the Court declines to require the defendant to articulate those precise areas of inquiry in which its attempted discovery was frustrated. The better course of action, in the Court's estimation, is to permit defendant to depose Ms. Armstrong *de novo*. In doing so, however, the Court expects defendant to proceed as expeditiously as its counsel's professional responsibilities permit.

Both parties suggest that the deposition be conducted before a special master; this Court will supervise the deposition, which will proceed in the chambers of the undersigned.[3] Counsel will advise the

---

[3] Although the Court does not expect to attend the entire deposition, the Court will make itself available to resolve any issues that might arise during the course of the deposition.

5

Court of the date and time of the rescheduled deposition.

Defendant also seeks an award of sanctions. The Court declines to assess sanctions at this juncture. However, the Court cautions counsel and the parties to proceed in a spirit of civility and cooperation. It is a sad commentary, indeed, to have to remind parties and counsel that the incivility and evasiveness reflected in this file has no place in the judicial process. Such litigation tactics are not effective of their apparently intended result; they serve only to demean the user as well as the Court.

Defendant's motion for sanctions, Doc. No. 130, and plaintiff's cross-motion for a protective order, Doc. No. 141, are **GRANTED in part**. The deposition of Joyce Armstrong will proceed on terms consistent with the foregoing.


December 13, 2007                          *s/Norah McCann King*
                                           Norah M<sup>c</sup>Cann King
                                           United States Magistrate Judge