IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

The Scotts Company LLC,

      Plaintiff,

      v.                         Case No. 2:06-cv-899

Liberty Mutual Insurance
Company,

      Defendant.


<u>OPINION AND ORDER</u>

This is an action filed by plaintiff The Scott's Company LLC ("Scotts") against defendant Liberty Mutual Insurance Company ("Liberty Mutual").  Jurisdiction is based on diversity of citizenship.  Scotts is a company incorporated under the laws of Ohio, with its principal place of business in Marysville, Ohio. Liberty Mutual is a Massachusetts corporation with its principal place of business in that state.  Scotts has been in existence in various forms and under various names since 1868.  Scotts was owned by International Telephone and Telegraph Corporation ("ITT"), a new York corporation, between 1971 and 1986, but thereafter Scotts regained its status as an independent company.

<u>I. History of the Case</u>

Scotts manufactures and sells a variety of lawn care and garden products, some of which contain substances considered hazardous under environmental regulations.  Beginning in the 1980s, Scotts was faced with a number of regulatory actions filed by the United States and Ohio Environmental Protection Agencies stemming from Scotts' manufacturing activities at the Marysville plant.  In 1997, the Ohio Attorney General initiated proceedings against

Scotts to compel remediation of pollution at the Marysville facility.

In response to this litigation, Scotts implemented the "Environmental Recovery Project" to negotiate with its past insurers to release any obligation for future environmental claims in exchange for a lump-sum cash payment. Joyce Armstrong, Scott's risk manager, headed the project. Ms. Armstrong is a Chartered Property and Casualty Underwriter with over twenty years of experience in the insurance industry. In January of 1998, Scotts retained Dispute Resolution Management, Inc. ("DRM"), a consulting firm which specializes in the "cashing in" of pollution claims under old insurance policies, to assist Scotts in settling its pollution claims with its past insurers. Scotts' principal contact at DRM was Diane Archangeli.[1] Ms. Archangeli is an attorney with prior experience in the insurance industry, including serving as in-house counsel for Travelers and Aetna.

As part of the recovery project, Scotts and DRM contacted insurers which had allegedly issued policies to Scotts from the late 1950s to 1971, and to ITT during the period from 1971 to 1986 during which ITT owned Scotts. These insurers included Liberty Mutual, Wausau, and PEIC. Scotts also contacted ITT to investigate whether funds would be available under policies issued to ITT while it owned Scotts.

Ms. Armstrong contacted Liberty Mutual by letter dated August 14, 1998, and requested copies of any general liability insurance policies issued to Scotts in the 1950s and 1960s. Doc. No. 167,

---

[1]Ms. Archangeli has since married and changed her name to Diane Butler. Her name was Butler when she was deposed. However, because her former name appears in the extensive documentary evidence, the court will refer to her as "Ms. Archangeli" in this opinion.

Francisco Decl. Ex. J.  Scotts claimed to have secondary evidence of policies allegedly issued by Liberty Mutual in the 1960s, and indicated that general liability policies may also have been issued by Liberty Mutual to Scotts in the 1950s.  The documents submitted with the letter related to automobile injury and property damage claims.  Liberty Mutual did a preliminary search of its records, and notified Ms. Archangeli that it was unable to locate any policies.  Prior to 1978, Liberty Mutual's document retention practices called for keeping copies of insurance policies only six or seven years past their expiration date.  Doc. No. 167, Francisco Decl. Exs. O, P.

In a letter dated October 5, 1998, Ms. Archangeli informed Liberty Mutual about information provided by Wausau Insurance concerning general and umbrella coverage.  Doc. 167, Francisco Decl. Ex. S.  This information included a declaration page for an umbrella excess policy allegedly issued by Liberty Mutual under policy number LEI-181-01-660-097, in effect from 10-1-67 to 10-1-68, with policy limits of $5 million per occurrence/aggregated excess of underlying limits; two endorsements; and an umbrella excess liability policy jacket.  Item 6 of the umbrella policy refers to Liberty Mutual as the carrier for a 1967-1968 CGL policy, number LPI-181-010660-077, with property damage limits of $100,000 per occurrence and in the aggregate.  The documents also included lists of public liability open claims from Scotts from 10-1-58 through 6-20-67 and automobile open claims from 1-1-59 to 10-1-66. LM Tab 11.

By letter from Ms. Armstrong dated December 28, 1998, Scotts provided Liberty Mutual with notice of potential environmental claims.  Doc. 167, Francisco Decl. Ex. M.  In addition to the

3

policy numbers provided above, the letter referred to policy number LG1-621-004092-033, dated 12-31-73 to 12-31-76, allegedly issued by Liberty Mutual to Scotts during the period Scotts was owned by ITT. Ms. Armstrong requested that Liberty Mutual review its records and provide Scotts with any policies which were issued to Scotts, as well as any policies issued to ITT which included Scotts as a named insured.

The parties entered into negotiations toward the resolution of Scotts' environmental claims.  On March 5, 1999, Ms. Archangeli made a PowerPoint presentation to Liberty Mutual on Scotts' behalf concerning the history of Scotts' environmental pollution problems dating back to the early 1980s and the projected clean-up costs. See Letter of March 4, 1999, from Ms. Archangeli to Liberty Mutual, Doc. 167, Francisco Decl. Ex. B.  Scotts indicated that it had $9.8 million in environmental claims, and that it was willing to accept $4.5 million from Liberty Mutual to settle all past, present and future environmental claims.

In a letter dated April 27, 1999, Brian Merchant, an environmental claims specialist with Liberty Mutual, advised Ms. Archangeli that he had found three policies issued to ITT from the mid-1970s, but that he had been unable to locate any policies issued to Scotts during the 1950s and 1960s.  Doc. No. 167, Francisco Decl. Ex. Q.  He indicated that Liberty Mutual was continuing its search for any policies issued to Scotts.

By letter dated May 18, 1999, Ms. Archangeli advised Mr. Merchant that Scotts was only seeking coverage for claims related to its Marysville facility and eighteen third party sites.  Doc. No. 167, Francisco Decl. Ex. CC.  Ms. Archangeli acknowledged receipt of the ITT policies.  Id.  Ms. Archangeli further stated:

4

> Scotts is content to negotiate a settlement based upon the policy information that is available at this point in time. It seems unlikely to us that after nine months of looking for these policies, Liberty Mutual will turn up any new policy information. Therefore, rather than delay negotiations while you continue to look for policies, we propose again that we try to negotiate a resolution to Scotts' environmental claims based on the facts as we know them today.

Ex. CC. In a letter to Mr. Merchant dated July 22, 1999, Ms. Archangeli stated, "Scotts still feels that an amicable resolution of its claim is possible and is committed to working with Liberty Mutual in order [to] expedite a settlement of this matter." Doc. No. 167, Francisco Decl. Ex. DD.

By cover letter dated August 27, 1999, Terri Yahia, in-house counsel for Liberty Mutual, sent copies of "documents which Liberty Mutual located during its internal search for any and all documents relating to OM Scotts and other entities for which OM Scotts indicated it may be seeking coverage." Doc. No. 167, Francisco Decl. Ex. U. She stated that Liberty Mutual did not locate any relevant policies during its search, and that the only documents not forwarded to Scotts related to reinsurance and directors' and officers' coverage, not to general liability coverage.

In a letter to Ms. Archangeli dated December 6, 1999, Mr. Merchant noted that the documents provided by Scotts did not include any primary liability policies, and that Liberty Mutual's internal search had not located any primary or excess liability policies of insurance issued to Scotts. Doc. No. 167, Francisco Decl. Ex. R. He indicated that various documents had been found, and that these had been sent to Ms. Archangeli in a previous letter (presumably the letter of August 27, 1999). Mr. Merchant further stated that, in the absence of any primary liability policies

5

issued by Liberty Mutual to Scotts, Liberty Mutual would not provide any coverage under the alleged primary policies. He stated that Liberty Mutual had been unable to verify that the documents relating to the umbrella excess policy obtained from Wausau constituted a complete and accurate copy of all of the terms and conditions of any policy that may have been issued by Liberty Mutual to Scotts. Mr. Merchant further indicated that Liberty Mutual was reserving its right to assert various defenses to the claims, including lack of coverage, lack of timely notice of the claims, lack of a duty to defend, the possibility of a pollution exclusion in the alleged policies, and the operation and exhaustion of policy limits of liability.

In a letter to Ms. Archangeli dated March 3, 2000, Mr. Merchant questioned some of the costs submitted by Scotts, noting the lack of invoices for those costs. Doc. No. 167, Francisco Decl. Ex. Y. In a letter dated March 23, 2000, Ms. Archangeli informed Mr. Merchant that Scotts had been unable to locate invoices for all of the remediation expenditures, but asserted that other documents supported these claims. Doc. No. 167, Ex. T. She also noted that Scotts had recently found a premium invoice for policy number LP1-181-01066-075 TD 92, which showed the premium paid for a three-year general liability policy allegedly issued by Liberty Mutual to Scotts from 10-1-65 through 10-1-68. Since, at that point, Scotts had settled its claims against ITT for $2 million, Ms. Archangeli indicated that Scotts was no longer seeking payment for damages that occurred while Scotts was a named insured under the ITT policies. She stated that Scotts had revised its damages estimate based on alleged coverage from October 1957 through October 1, 1968, arriving at a figure of $3,434,076. Ms.

Archangeli indicated that after applying discounts for defenses which Liberty Mutual could be expected to assert, Scotts was now willing to settle the claims for $2.4 million.

By letter dated May 26, 2000, Ms. Archangeli summarized the documents upon which Scotts was relying to substantiate its damage claims and the existence of coverage.  Doc. No. 167, Francisco Decl. Ex. Z.  She referred to a Wausau internal underwriting memorandum dated October 1, 1968, which discussed Liberty Mutual's long history as a Scotts insurance carrier, and evidence concerning the alleged Liberty Mutual umbrella excess policy number LEI-181-010660-097 (10-1-67 to 10-1-68) and the underlying CGL insurance policy number LP1-181-010660-077, including an open claims list from 10-1-58 through 6-20-67.  Ms. Archangeli stated, "While Terry [Yahia] was not sure that the claim numbers listed were actually Liberty Mutual claim numbers, Georges Prouty [formerly of Liberty Mutual's environmental section] was unequivocal in his statement that the claim numbers listed on these sheets are actually old Liberty claim numbers."  Ex. Z.  She also pointed to documents in the Wausau underwriting file which identified Liberty Mutual as a prior carrier which wrote public liability, general liability, and umbrella coverage for Scotts from the late 1950s, and noted that a former risk manager for Scotts and a former Liberty Mutual underwriter recalled that Liberty wrote insurance for Scotts.

The parties continued their settlement negotiations, and a Settlement Agreement and Release ("the Release") was executed on July 12, 2000.  Doc. No. 167, Francisco Decl. Ex. BB.  Scotts also negotiated releases with Wausau and PEIC in exchange for lump-sum settlements.

Under the Release signed by Liberty Mutual and Scotts, Liberty

Mutual agreed to pay Scotts the sum of $650,000, and Scotts agreed that "this payment exhausts all limits under all Policies." Release, Section III. The term "Policies" is defined as meaning "any and all general liability insurance policies, contracts or agreements, sold or issued, or alleged to have been sold or issued, by Liberty Mutual to [Scotts] or [ITT] prior to the date of this Agreement." Release, Section I.A. In consideration for this payment, Scotts agreed in Section IV of the Release to release Liberty Mutual from "any and all liability, duty or obligation under the Policies" with respect to:

> (i) Any and all past, present, and future Claims, whether known or unknown; and
>
> (ii) Any and all claims for compensatory, punitive, consequential, statutory, or extra-contractual damages based upon any allegations of bad faith, unfair claims practices, unfair trade practices or other act or failure to act in connection with the investigation, handling, adjustment, litigation or settlement of any Claims referred to in IV.(i) above.

Release, Section IV.

> The term "Claims" is defined as
>
> all past, present and future claims, demands, actions, suits, proceedings, demands [sic], requests, obligations and liabilities of any kind, nature and description whatsoever, whether known or unknown, asserted or unasserted, which have ever been or which may in the future be made by any Person or entity seeking any relief of any kind, nature and description whatsoever.

Release, Section I.D.

The Release contained a provision concerning the exhaustion of policies:

> The Parties further acknowledge and stipulate that upon Liberty's payment of the Settlement Amount, all of the available bodily injury, personal injury, and property

> damage aggregate limits, and/or any other aggregate
> limits contained in or any available coverage under each
> of the Policies issued or allegedly issued are exhausted
> in full and complete satisfaction of any and all
> obligations of any nature whatsoever of Liberty.  With
> respect to the [ITT] policies only, the aggregate limits
> under these policies will be deemed to be exhausted only
> with respect to [Scotts].

Release, Section VI.  Scotts also agreed to defend, indemnify, and hold Liberty Mutual harmless from any past, present and future claims or actions which have been or may be asserted by any person or entity against Liberty Mutual arising out of the released claims.  Release, Section IX.  The Release further states that the Release "is intended to be and is a commercial accommodation between the Parties hereto and shall not be construed as an admission of coverage under the Policies[.]"  Release, Section X.

Subsequent to the execution of the Release, Scotts was faced with new claims, including asbestos claims.  In 2003, Scotts hired law firms to conduct a thorough search of the company's records in storage facilities throughout the country.  The search did not result in the discovery of any Liberty Mutual policies, but did uncover documents related to claims purportedly filed against Liberty Mutual policies, including a previously unknown policy number.  Scotts filed the instant action against Liberty Mutual seeking to rescind the Release, and also filed similar actions against Wausau, PEIC, and ITT.

In the first amended complaint filed in this action on February 5, 2007, Scotts asserts claims under Ohio law.  In Count One, Scotts asserts a claim for breach of fiduciary duty, alleging that Liberty Mutual breached its fiduciary duty to Scotts by failing to disclose information regarding coverage, making false

representations about the lack of information, and concealing evidence relevant to the Release.  In Count Two, Scotts asserts a claim of fraud in connection with Liberty Mutual's negotiation of the Release.  In Count Three, Scotts asserts a claim for breach of contract, seeking to establish coverage for asbestos claims under Liberty Mutual policies allegedly in existence from 1958 to 1968 and the 1974-1977 ITT policies, as well as coverage for the environmental clean-up of the Marysville site under policies allegedly in existence from 1958 to 1968.  Count Four asserts that Liberty Mutual breached its contract with Scotts by breaching the covenant of good faith and fair dealing in performing its obligations under the alleged policies.  In Count Five, Scotts asserts that Liberty Mutual acted in bad faith in the handling, processing and payment of claims made by Scotts, and in denying coverage for Scotts' claims.  The bad faith claim has been stayed pending the resolution of Scotts' other claims.  <u>See</u> Doc. No. 161. Finally, in Count Six, Scotts seeks the remedy of rescission of the Release, claiming that the Release was induced by fraud and/or mistake, and was the product of Liberty Mutual's breach of fiduciary duty.

This matter is before the court on Liberty Mutual's motion for summary judgment, and for sanctions pursuant to Fed.R.Civ.P. 11. In addition, Scotts has filed a motion for partial summary judgment on Counts Three and Four of the first amended complaint, those being the breach of contract claims.

## II. Summary Judgment Standards

The procedure for granting summary judgment is found in Fed. R. Civ. P. 56(c), which provides:

The judgment sought shall be rendered forthwith if the

10

> pleadings, depositions, answers to interrogatories and
> admissions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material
> fact and that the moving party is entitled to judgment as
> a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).

The Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex and Matsushita effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. Street v. J. C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). The court in Street identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. Id. at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Id. (quoting Liberty

11

Lobby, 477 U.S. at 257).  The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. Id.  It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" Id. (quoting Matsushita, 475 U.S. at 586).  Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  Id.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

III. The Release

Liberty Mutual's motion for summary judgment raises the issue of the validity of the Release.  A release is a contract that is favored by the law to encourage the private resolution of disputes. Lewis v. Mathes, 161 Ohio App.3d 1, 7, 829 N.E.2d 318 (2005).  A release of a cause of action ordinarily acts as an absolute bar to any later action on any claim encompassed within the release. Haller v. Borror Corp., 50 Ohio St.3d 10, 13, 552 N.E.2d 207 (1990).  A releasor may avoid that bar by alleging that the release was obtained by fraud, see id., or was the result of mutual mistake, see Pizzino v. Lightning Rod Mutual Insurance Co., 93 Ohio App.3d 246, 252, 638 N.E.2d 146 (1994).  A contract may also be void for reasons pertaining to breach of fiduciary duty.  High Caliber Range Club, Inc. v. Komer, No. 47985 (8th Dist. unreported), 1984 WL 6358 at *4 (Ohio App. Dec. 13, 1984).  See, e.g., Williams Electronics Games, Inc. v. Garrity, 366 F.3d 569, 580 (7th Cir. 2004)(under Illinois law, a release obtained by breach of a fiduciary obligation is unenforceable).

Since a release is a kind of contract, the rules generally

applicable to contracts, such as the requirement of an offer and acceptance, apply. See Noroski v. Fallet, 2 Ohio St.3d 77, 79, 442 N.E.2d 1302 (1982). Where a contract is clear and unambiguous, its interpretation is a matter of law. Latina v. Woodpath Development Co., 57 Ohio St.3d 212, 214, 567 N.E.2d 262 (1991); Lewis, 161 Ohio App.3d at 8 (where release is clear and unambiguous, its interpretation is a matter of law). In construing the terms of a contract, the primary objective is to ascertain and give effect to the intent of the parties. Hamilton Ins. Serv. Inc. v. Nationwide Ins. Cos., 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999). The intent of the parties is presumed to reside in the language they choose to employ in their agreement. Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth., 78 Ohio St.3d 353, 362, 678 N.E.2d 519 (1997). Absent fraud or mutual mistake, broadly-worded releases are generally construed to include all prior conduct between the parties, even if the scope of such conduct or its damage is unknown to the releasor. Denlinger v. City of Columbus, Ohio Public Schools, No. 00AP-315 (10th Dist. unreported), 2000 WL 1803923 *5 (Ohio App. Dec. 7, 2000).

The language of the Release in this case is clear and unambiguous. The Release bars all past, present and future claims, both known and unknown, asserted or unasserted, under any and all general liability insurance policies issued by Liberty Mutual to Scotts or ITT prior to July 12, 2000, the date of the release. The parties also agreed that upon payment of the settlement by Liberty Mutual, all policy limits were deemed to be exhausted in full and complete satisfaction of any and all obligations of any nature whatsoever of Liberty. The language of the Release is broad enough to encompass any breach of fiduciary duty claim relating to the

handling of the environmental claims submitted by Scotts to Liberty Mutual prior to the execution of the release, as well as the claims asserted in Counts Three and Four of the first amended complaint. Those claims are barred by the Release if it is valid.  Thus, the court must determine whether genuine issues of fact exist in regard to whether the Release is invalid or subject to rescission due to a breach of fiduciary duty, fraud or mutual mistake.

IV. Failure to Allege Fraud under Fed.R.Civ.P. 9(b)

In regard to Scotts' fraud-based claims, Liberty Mutual argues that Scotts has failed to plead fraud with particularity, as required by Fed.R.Civ.P. 9(b).  Liberty Mutual correctly notes that the only allegation of fraudulent conduct pleaded with any degree of specificity is contained in paragraph 17 of the first amended complaint, where Scotts alleges that Liberty Mutual denied that the open claims attached to the umbrella policy found by Scotts were Liberty Mutual numbers.  Scotts is no longer relying on this allegation to establish its fraud claim.  Scotts has never moved to amend its complaint to allege additional acts of fraud, but rather made additional allegations of alleged fraudulent conduct for the first time in its memorandum opposing Liberty Mutual's July 11, 2007, motion for sanctions, filed August 8, 2007 (Doc. No. 119), and in its response to Liberty Mutual's January 15, 2008, motion for summary judgment, filed February 8, 2008 (Doc. No. 198). Liberty Mutual argues that since Scotts failed to allege any other acts of fraud in the first amended complaint sufficient to satisfy the requirements of Rule 9(b), that failure warrants the entry of summary judgment on the fraud-based claims.

Rule 9(b) requires that averments of fraud must be stated with particularity.  Ullmo ex rel. Ullmo v. Gilmour Academy, 273 F.3d

14

671, 678 (6th Cir. 2001).  The Sixth Circuit reads this rule liberally, requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which plaintiff relied, the fraudulent scheme, the fraudulent intent of the defendants, and the injury resulting from the fraud.  Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993).  Likewise, where a breach of fiduciary duty claim is based on fraud, the fraud must be pleaded with particularity.  See In re National Century Financial Enterprises, Inc., Investment Litigation, 504 F.Supp.2d 287, 311 (S.D.Ohio 2007).

Several circuits have held that a district court may enter summary judgment dismissing a complaint alleging fraud if the complaint fails to satisfy the requirements of Rule 9(b).  See Sanchez v. Triple-S Management, Corp., 492 F.3d 1, 12 (1st Cir. 2007); Dongelewicz v. PNC Bank National Assoc., 104 Fed. App'x 811, 819 n. 4 (3d Cir. 2004)(noting that a contention of fraud in a brief may not be used as a substitute for an allegation in a complaint in light of Rule 9(b)'s requirements); Caballero-Rivera v. Chase Manhattan Bank, N.A., 276 F.3d 85, 87 n. 3 (1st Cir. 2002); U.S. ex rel. Schwartz v. Coastal Healthcare Group, Inc., 232 F.3d 902 (table), 2000 WL 1595976 *4 (10th Cir. 2000)(Rule 9(b) deficiency can be resolved by summary judgment); Murr Plumbing, Inc. v. Scherer Brothers Financial Services Co., 48 F.3d 1066, 1070 (8th Cir. 1995)(district court may enter summary judgment dismissing a complaint alleging fraud if the complaint fails to satisfy the requirements of Rule 9(b)); Whalen v. Carter, 954 F.2d 1087, 1098 (5th Cir. 1992)(upholding summary judgment on fraud claim for failure to comply with Rule 9(b), noting that the failure to state a claim is the functional equivalent of failure to raise a genuine

issue of material fact).  In <u>Ullmo</u>, 273 F.3d at 677-78, the Sixth Circuit declined to consider a fraud claim which was raised for the first time on appeal.  In <u>Jude v. Inez Deposit Bank</u>, 968 F.2d 1215 (table), 1992 WL 158877 *4 (6th Cir. 1992), the Sixth Circuit upheld the award of summary judgment where plaintiff's complaint failed to plead fraud as required under Rule 9(b).  However, in those cases, the Sixth Circuit did not clearly address the issue of whether it is appropriate to enforce Rule 9(b) in summary judgment proceedings.

In contrast, the Ninth Circuit in <u>Cable & Computer Technology Inc. v. Lockheed Sanders, Inc.</u>, 214 F.3d 1030, 1038(9th Cir. 2000), held that it was error for the district court to apply Rule 9(b) to a summary judgment motion, where evidence, not pleading, was to be considered.  In <u>Schriemer v. Greenburg</u>, 931 F.2d 893 (table), 1991 WL 66552 *2 (6th Cir. 1991), the court noted that "[n]either the pleadings nor the evidence proffered on summary judgment" met the requirements of Rule 9(b), thus suggesting that evidence submitted in summary judgment proceedings could be considered.  The Sixth Circuit has also noted that in the absence of a motion for a more definite statement under Fed.R.Civ.P. 12(e), dismissal on the sole basis of failure to comply with Rule 9(b) "would not be appropriate." <u>Coffey</u>, 2 F.3d at 162.

The purpose of Rule 9(b) is to provide a defendant with "at least the minimum degree of detail necessary to begin a competent defense. <u>U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.</u>, 532 F.3d 496, 504 (6th Cir. 2008).  Another purpose of the rule is to discourage fishing expeditions and strike suits which appear more likely to consume a defendants resources than to reveal evidences of wrongdoing.  <u>Id</u>.  "Because the defendant is informed of which of

its specific actions allegedly constitute fraud, it can limit discovery and subsequent litigation to matters relevant to these allegations." Id. In addition, fair notice of the nature of a plaintiff's fraud claim can assist the defendant in determining what evidence to look for or elicit in discovery.

The court is concerned that the pleadings in the instant case have not promoted the above purposes. Having reviewed the exhaustive record in this case, it is apparent that Scotts either knew or should have been aware of all of the alleged acts of fraud upon which it now relies prior to the filing of the first amended complaint on February 5, 2007, with the exception of the 2007 loss run, which is dated February 6, 2007, the day after the first amended complaint was filed. Despite this knowledge, Scotts never moved to further amend its fraud claim in the complaint. Instead, Scotts waited until August of 2007, after Liberty Mutual moved for dismissal as a Rule 11 sanction, to make additional allegations of fraud in its memorandum contra, then asserted even more allegations of fraud in its response to Liberty Mutual's motion for summary judgment, after the close of discovery on December 21, 2007. See Pretrial Scheduling Order, Doc. No. 114. Although Scotts characterizes its forty separate allegations of fraud as mere evidence, these allegations are not simply evidence supporting the one arguably Rule 9(b)-compliant allegation of fraud in the complaint, but rather are additional allegations of fraud which should have been pleaded with particularity under Rule 9(b).

Liberty Mutual did not file a motion to dismiss the complaint due to the fact that the complaint arguably pleaded at least one allegation of fraud with particularity. Liberty Mutual also did not file a motion under Fed.R.Civ.P. 12(e) for a more definite

17

statement; however, until Scotts filed its response to Liberty Mutual's motion for sanctions in August of 2007, Liberty Mutual could reasonably have been misled by the single well-plead allegation of fraud into thinking that this was the only act of fraud underlying the fraud claim.

The unusual circumstances of this case lend significant support to the approach taken by other circuits which permit the enforcement of Rule 9(b) in summary judgment proceedings, and this court would be inclined to follow that view. However, the Sixth Circuit has not definitively decided the issue, and the fraud claims in this case have now been fully briefed on summary judgment. Therefore, in the alternative and in the interests of judicial economy, the court will address whether summary judgment is appropriate on Scotts' fraud-based claims based on the evidence presented.

V. Count One - Breach of Fiduciary Duty

Liberty Mutual has moved for summary judgment on Scotts' breach of fiduciary duty claim. In this claim, Scotts alleges that, as Scotts' insurer, Liberty Mutual owed a fiduciary obligation to Scotts. Scotts further asserts that Liberty Mutual breached a fiduciary obligation to Scotts during the negotiations leading to the execution of the Release by allegedly failing to disclose information relevant to coverage under policies allegedly issued by Liberty Mutual to Scotts, by deliberately concealing information regarding the existence of coverage which would have been material to Scotts' decision to enter into the Release, and by intentionally or recklessly misrepresenting that it did not have secondary evidence of coverage. In Count Six, Scotts claims that this alleged breach of fiduciary duty warrants rescission of the

Release.

Liberty Mutual first argues that the breach of fiduciary duty claim is barred by the four-year statute of limitations applicable to actions for breach of fiduciary duty. See Ohio Rev. Code §2305.09. The limitations period for actions for breach of fiduciary duty under Ohio law is the four-year period found in §2305.09. Crosby v. Beam, 83 Ohio App.3d 501, 509, 615 N.E.2d 294 (1992). An action for breach of fiduciary duty accrues "in the absence of undiscovered fraud" when the fiduciary relationship is terminated. State ex rel. Lien v. House, 144 Ohio St. 238, syllabus para. 2, 58 N.E.2d 675 (1944). In this case, the claim would have accrued on July 12, 2000, when the settlement negotiations between Scotts and Liberty Mutual were concluded with the signing of the Release. The original complaint in the instant case was filed on October 25, 2006, over six years later. However, Scotts argues that the statute of limitations should be tolled by the discovery provision in §2305.09, which states that a cause of action "shall not accrue ... until the fraud is discovered."

"The 'discovery rule' generally provides that a cause of action accrues for purposes of the governing statute of limitations at the time when the plaintiff discovers or, in the exercise of reasonable care, should have discovered the complained of injury." Investors REIT One v. Jacobs, 46 Ohio St.3d 176, 179, 546 N.E.2d 206 (1989). Where a claim for breach of fiduciary duty is based on negligence or matters other than fraud, the discovery rule does not apply. Helman v. EPL Prolong, Inc., 139 Ohio App.3d 231, 249, 743 N.E.2d 484 (2000)(claim for breach of fiduciary duty stemming from transfer of assets accrued when the act or commission constituting the breach of fiduciary duty occurred and the discovery rule did

not apply); <u>Kondrat v. Morris</u>, 118 Ohio App.3d 198, 207, 692 N.E.2d 246 (1997)(discovery provision did not toll limitations period for breach of fiduciary duty claim based on negligence); <u>Herbert v. Banc One Brokerage Corp.</u>, 93 Ohio App.3d 271, 273-74, 638 N.E.2d 161 (1994)(breach of fiduciary duty claim based on negligent failure to train and supervise employee not tolled by discovery rule). However, in the case of a fraudulent breach of fiduciary duty, the discovery rule applies. <u>Orvets v. National City Bank, Northeast</u>, 131 Ohio App.3d 180, 189, 722 N.E.2d 114 (1999).

To the extent that Scotts' claim is based on conduct which falls short of fraud, such as a mere negligent failure to disclose information during the settlement negotiations or nonfraudulent mishandling of the environmental claims submitted by Scotts, it is barred by the statute of limitations. Insofar as this claim is based on alleged fraud, the discovery rule may be invoked to toll the limitations period. However, the court need not decide whether the fraud aspect of Scotts' breach of fiduciary duty claim is time-barred, because the court concludes that summary judgment is appropriate on this claim on other grounds.

Liberty Mutual argues that the breach of fiduciary duty claim fails because the evidence is insufficient to create a genuine issue of material fact as to the existence of a fiduciary relationship between Liberty Mutual and Scotts in regard to the negotiation of the Release. If Liberty Mutual owed no fiduciary duty to Scotts in negotiating the Release, then this claim fails, and therefore cannot serve as a basis for rescinding the Release.

A breach of fiduciary duty claim has three elements: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe such duty; and (3) an injury proximately

resulting therefrom. <u>Strock v. Pressnell</u>, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988). Under Ohio law, fiduciary duties can arise either by law or by the operation of the relationship between the parties. <u>Stone v. Davis</u>, 66 Ohio St.2d 74, 419 N.E.2d 1094 (1981). A fiduciary relationship is defined as a relationship "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." <u>Schory & Sons, Inc. v. Society National Bank</u>, 75 Ohio St.3d 433, 442, 662 N.E.2d 1074 (1996). A fiduciary relationship is not unilaterally created; rather, both parties must understand that a special trust or confidence has been reposed in the relationship. <u>Umbaugh Pole Building Co., Inc. v. Scott</u>, 58 Ohio St.2d 282, syllabus para. 1, 390 N.E.2d 320 (1979).

In Ohio, an insurance company has a fiduciary responsibility toward its insured to act in good faith toward its insured in carrying out its duties under the contract. <u>Motorists Mut. Ins. Co. v. Said</u>, 63 Ohio St.3d 690, 694, 590 N.E.2d 1228 (1992), <u>overruled in part on other grounds</u>, <u>Zoppo v. Homestead Ins. Co.</u>, 71 Ohio St.3d 552, 644 N.E.2d 397 (1994). However, Scotts' claim, which is based on an alleged breach of fiduciary duty in connection with the negotiations for the Release, does not involve an alleged mishandling of a particular claim for insurance benefits, but rather the negotiation of an omnibus settlement where the very existence of the policies and the precise nature of any insurance coverage under those alleged policies were in dispute.

Liberty Mutual correctly notes that under Ohio law, in the absence of special circumstances, no fiduciary relationship exists between parties negotiating an arm's-length commercial transaction.

21

Landskroner v. Landskroner, 154 Ohio App.3d 471, 485-86, 797 N.E.2d 1002 (2003)(citing Blon v. Bank One, Akron, N.A., 35 Ohio St.3d 98, 101, 519 N.E.2d 363 (1988)).  "[I]n business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other." Blon, 35 Ohio St.3d at 101.  The fact that one party possesses more expertise concerning the matter under negotiation is insufficient in itself to establish a special relationship of trust.  Greenberg v. Life Insurance Co. of Virginia, 177 F.3d 507, 521-22 (6th Cir. 1999)(purchasers of life insurance policies failed to state claim against insurer for breach of fiduciary duty, citing Ohio law).

Ohio courts have not addressed the precise question of whether an insurance company owes a fiduciary duty to a business entity claiming to be an insured, where arms-length negotiations occur concerning the existence of insurance policies and a release from any obligation under the alleged policies.  However, Liberty Mutual notes that Ohio courts have declined to find a fiduciary relationship in analogous commercial situations.

For example, in Ed Schory & Sons, the Ohio Supreme Court held that there was no fiduciary relationship between debtor and creditor where the creditor and debtor were dealing at arm's length in a commercial context, with each party protecting its own interests.  75 Ohio St.3d at 442-43.  The court noted in that case that neither party had, or could have had, a reasonable expectation that the creditor would act solely or primarily on behalf of the debtor, particularly since the debtor was not an unsophisticated individual, but rather an experienced developer who had been

involved in thousands of loans. Id. at 443.

In Blon, the Ohio Supreme Court held that the creditor bank had no duty to disclose to the borrower the existence and details of a finder's fee or similar arrangement with a credit manager. Blon, 35 Ohio St.3d at 368. The court concluded that the bank did not have a fiduciary relationship with the debtor because the credit arrangement was an ordinary arm's-length transaction, where each party sought the desired advantages of the transaction, and the debtor had previous experience with credit transactions. Id. at 367-68. See also Groob v. KeyBank, 108 Ohio St.3d 348, 353, 843 N.E.2d 1170 (2006)(no fiduciary duty arose between bank and prospective borrower where there were no special circumstances, and where parties were dealing at arm's length, looking out for their own best interests); Umbaugh Pole, 58 Ohio St.2d at 58 (debtor-creditor relationship did not create a fiduciary relationship where debtors entered into a relationship with "an institutional lender in a commercial context in which the parties dealt at arms length, each protecting his own interest.").

In another analogous situation, Ohio courts have held that the relationship of insurance agent and insured is not the type of relationship which automatically gives rise to a fiduciary relationship. See Nichols v. Schwendeman, No. 07AP-433 (10th Dist. unreported), 2007 WL 4305718 at *3 (Ohio App. Dec. 11, 2007)(noting that "Ohio courts have held that the relationship between an insurance agent and his client is generally not a fiduciary relationship, but, rather, an ordinary business relationship."); Advent v. Allstate Insurance Co., No. 05AP-1092 (10th Dist. unreported), 2006 WL 1495066 at *3 (Ohio App. June 1, 2006)(same); Slovak v. Adams, 141 Ohio App.3d 838, 846 n. 2, 753 N.E.2d 910

23

(2001)("'While the law has recognized a public interest in fostering certain professional relationships, such as the doctor-patient and attorney-client relationships, it has not recognized the insurance agent-client relationship to be of similar importance.'")(quoting Nielsen Enterprises, Inc. v. Ins. Unlimited Agency Inc., No. 85AP-781 (10th Dist. unreported), 1986 WL 5411 (Ohio App. May 8, 1986)).   A confidential relationship between insurance agent and insured cannot be unilateral, and both parties must understand that a special trust or confidence has been reposed.   Slovak, 141 Ohio App.3d at 847.   Where there is no evidence that the insurance agent understood that a special trust or confidence had been reposed, and that he was undertaking a special duty, no fiduciary relationship is created.   Id. (holding that where there was no evidence that agent understood that he was undertaking the responsibility of informing client regarding the nonrenewal of her policy or acquiring replacement coverage, no fiduciary relationship was created).

Although Liberty Mutual was technically the alleged underwriter of insurance coverage, not an insurance agent, the above cases suggest by analogy that Liberty Mutual's alleged status as an insurer is insufficient in itself to create a fiduciary duty owed by Liberty Mutual to Scotts for purposes of the parties' arms-length negotiations concerning the existence and scope of any alleged past policies.   The evidence shows that Scotts and Liberty Mutual negotiated for a one-time payment in settlement of any liability which Liberty Mutual might have had as a result of any general liability policies which Liberty Mutual may have issued to Scotts in the past.   Since neither Scotts nor Liberty Mutual could locate the actual policies, the existence of the policies was in

dispute.  These negotiations fall within the category of an arms-length business transaction, with each party protecting its own interests.  This is the type of relationship which, under Ohio law, would ordinarily not be fiduciary in nature in the absence of special circumstances where both parties understood that a special trust had been imposed.

No evidence of special circumstances has been presented in this case.  Scotts, a sophisticated business entity, had the assistance of its own experts.  Ms. Armstrong, Scotts' risk management director, had worked in the insurance area for over two decades, including working for insurance companies.  LM Tab 10, Armstrong Dep. pp. 956-57.  She had a CPCU (chartered property casualty underwriter) designation which required her to pass ten exams over the course of five years, including an exam on general liability insurance.  Id. at pp. 597-98.

Scotts also retained the services of DRM to assist with the negotiations.  Scotts' contact at DRM, Ms. Archangeli, is an attorney with prior experience in the insurance industry, including serving as in-house counsel for Travelers and Aetna.  See Doc. No. 167, Francisco Decl. Ex. D; LM Tab 33.  In a letter to Scotts dated August 27, 1997, Ms. Archangeli stated, "DRM is a management consulting practice specializing in business-oriented settlements of environmental and insurance related disputes."  Doc. No. 167, Francisco Decl. Ex. D.  DRM offered to assist Scotts' efforts to recover environmental remediation costs from its liability and property insurance carriers.  Id.  DRM's brochure states that its "highly specialized insurance archeology research is designed to fill gaps in coverage or identify coverage for the specific years in which the client has incurred liabilities."  Id.  DRM's

25

literature further states, "We have assembled a multi-disciplinary team of seasoned attorneys, MBAs and former insurance litigators and professionals to deliver this service."  Id.

There is no evidence in the record from which a jury could reasonably find that both Scotts and Liberty Mutual would have understood that a special trust and confidence had been reposed in Liberty Mutual to protect Scotts' interests during these negotiations, or that Liberty Mutual exerted a position of superiority or influence over Scotts.

Scotts has failed to produce evidence sufficient to raise a genuine issue of material fact as to the existence of a fiduciary relationship between Scotts and Liberty Mutual in regard to the negotiation of the Release.  Liberty Mutual is entitled to summary judgment on Scotts' breach of fiduciary duty claim.

VI. Count Two - Fraud

A. Introduction

Liberty Mutual argues that it is entitled to summary judgment on Scotts' fraud claim.  Liberty Mutual first contends that the fraud claim is barred by the limitations period applicable to fraud claims under §2305.09.  However, the court will not decide whether the fraud claim is time-barred, but will address whether genuine issues of fact have been shown to exist in regard to Scotts' fraud claim.

In order to establish a claim of fraud under Ohio law, Scotts must prove: (1) a representation, or silence  where there is a duty to disclose; (b) which is material to the transaction; (c) made falsely, with knowledge of its falsity, or with such utter disregard as to its truth or falsity that knowledge may be inferred; (4) with the intent to mislead another into relying upon

26

it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. <u>Williams v. Aetna Financial Co.</u>, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998).

The elements of the claim are conjunctive, and therefore all of them must be shown. <u>Graham v. American Cyanamid Co.</u>, 350 F.3d 496, 507 (6th Cir. 2003)(citing <u>Schwartz v. Capital Sav. & Loan Co.</u>, 56 Ohio App.2d 83, 381 N.E.2d 957, 959 (1978)). When the plaintiff seeks to set aside a written document, clear and convincing evidence of fraud is required. <u>Micrel, Inc. v. TRW, Inc.</u>, 486 F.3d 866, 873-74 (6th Cir. 2007)(in action for rescission of a settlement and mutual release agreement on the grounds of fraudulent inducement, plaintiff was required to prove fraud by clear and convincing evidence)(citing <u>Household Fin. Corp. v. Altenberg</u>, 5 Ohio St.2d 190, 214 N.E.2d 667, 669-70 (1966)).

A representation is material if it is essential to contract formation; in other words, if the contract would not be formed but for the representation, then the representation is material. <u>Burke Lakefront Services v. Lemieux</u>, No. 79665 (8th Dist. unreported), 2002 WL 1821962 *5 (Ohio App. Aug. 8, 2002). However, the statement must involve a past or present fact. "Generally, fraud is not predicated on a representation concerning a future event, as such representation is more in the nature of a promise or contract or constitutes mere predictions or opinions about what the future may bring." <u>Yo-Can, Inc. v. The Yogurt Exchange, Inc.</u>, 149 Ohio App.3d 513, 525, 778 N.E.2d 80 (2002); <u>see also</u> <u>Micrel, Inc.</u>, 486 F.3d at 874 (applying Ohio law).

In addition, to satisfy the elements of fraud, a representation must be as to a fact material in the transaction,

27

not mere opinion.  Aetna Insurance Co. v. Reed, 33 Ohio St. 283 (1877); Citizens Banking & Savings Co. v. Spitzer, Rorick & Co., 65 Ohio App. 309, 318, 29 N.E.2d 892 (1938).  In Reed, the Ohio Supreme Court stated:

> If the representation be mere matter of opinion, or of a fact equally within the knowledge of both parties, or one upon which the party had no right to rely, the representations, though acted on, will not vitiate the transaction.
>
> This is always the case where the parties are mutually cognizant of the facts acted on, or stand on an equal footing in relation to them, and there exists no fiduciary relation between them.  The law will not lend its aid to help one thus situated and advised, if he voluntarily neglects to protect himself by the exercise of his common sense.

33 Ohio St. at 292.

The court went on to state that in the absence of a fiduciary relationship, "misrepresentations, touching a party's legal rights, will generally afford no sufficient reason on which to avoid a contract.  Such representations, however erroneous and strongly asserted, are to be treated, when made to a party free to inform himself of his legal rights, as mere statements of opinion."  Id. at 294-95; see also Lynch v. Dial Finance Co. of Ohio No. 1, Inc., 101 Ohio App.3d 742, 750, 656 N.E.2d 714 (1995)(a representation of law concerning the transaction is an opinion and cannot form the basis of an action for fraud).

In Reed, the plaintiff alleged that he had been induced by fraudulent representations made by the defendant insurance company's adjuster, including statements concerning plaintiff's legal rights under the policies, into making a settlement and release of his rights under certain insurance policies.  The Ohio

Supreme Court held:

> Where an agent of an insurance company makes
> representations to one having a claim for a loss against
> the company, the parties standing in antagonistic
> relations to each other, that the latter had no claim or
> rights that he could enforce by legal proceedings, such
> representations are only opinion-representations upon
> which he had no right to rely; and if he does so rely, it
> must be at his own risk, because the truth or falsehood
> of such representations could be ascertained by ordinary
> diligence.

Reed, Syllabus Para. 3.

Scotts has submitted a list of forty paragraphs containing allegedly fraudulent statements or omissions on the part of Liberty Mutual. These allegations include citations to documents, affidavits, declarations and deposition testimony in the record which are relied upon by Scotts to show that the statements were made and that they were false. The court has reviewed the exhibits cited in these paragraphs, and, unless otherwise indicated, the cited materials constitute evidence that the alleged statements were made. Some of these alleged statements are related and will be grouped for purposes of discussion. The exhibits found in Scotts Supplemental Exhibit Binder will be referred to with the preface "Scotts Ex." The exhibits contained in the binder entitled Liberty Mutual Supplemental Exhibits will be referred to as "LM Tab" with the number designation, and the exhibits contained in the Liberty Mutual binder of exhibits referenced in the May 2, 2008, hearing on the motion for summary judgment will be referred to as "LM Tab" with the letter designation.

B. Failure to Locate Policies

The first group of allegations relates to statements by Liberty Mutual employees that no Scotts policies were located

during Liberty Mutual's search of its records:

> 1. On October 21, 1998, Christie O'Brien, Liberty Mutual's claims handler assigned to the Scotts matter, spoke with Ms. Archangeli and "[i]nformed her that we have not found any evidence or any policies for OM Scott." Oct. 21, 1998, O'Brien Log, Ex. A-5 [Scotts' Ex. 15].

The above statement is taken from the phone logs of Christie O'Brien, a Liberty Mutual environmental claims specialist, regarding her conversation with Ms. Archangeli. There is no evidence that, at the time this statement was made, Liberty Mutual had found any evidence of policies or policies which had been issued to Scotts. However, Scotts goes beyond the plain meaning of the statement and alleges that the reference to "any evidence" was false because it suggested that Liberty Mutual had already begun the search for secondary evidence, when, according to Scotts, it had not. Scotts also repeats this argument concerning secondary evidence in several of the allegations of fraud discussed below.

A jury could not reasonably find that the matter of whether Liberty Mutual was searching for secondary evidence prior to April 22, 1999, when the Phase II request was distributed, was material. In regard to this particular claim, there is no reason why the issue of whether Liberty Mutual was searching for secondary evidence in October of 1998 was material to the settlement in July of 2000. Ms. O'Brien's statement was made early in the investigation process. The search for policies continued, as evidenced by three additional policy search requests made to the Liberty Mutual librarian dated December 3, 1998, January 20, 1999, and March 3, 1999. LM Tabs 2-4. These searches were followed by a broader Phase II search request for documents dated April 22, 1999, which was sent to twenty-eight Liberty Mutual offices and

divisions.  See LM Tab 5.  The documents found as a result of these searches were sent to Ms. Archangeli by Ms. Yahia with the cover letter dated August 27, 1999.  LM Tab 7.

There is also no evidence that Scotts relied on Ms. O'Brien's statement, or that such reliance would have been reasonable. Scotts did not abandon its claims against Liberty Mutual after hearing Ms. O'Brien's report.  Rather, Scotts gave notice of its pollution claims by letter dated December 28, 1998, and asked for copies of ITT policies.  LM Tab 8.  Scotts also continued to supply information to Liberty Mutual to further the search for documents which would support its claims.  For example, additional records were furnished to Scotts by Letter dated March 23, 2000, from Ms. Archangeli to Mr. Merchant.  LM Tab 12.  As late as June 5, 2000, Ms. Armstrong spoke with Robert Kostecki of Liberty Mutual and requested that Liberty Mutual keep looking for policies.  LM Tab 28.  Scotts was aware that Liberty Mutual was continuing to search for documents even during the final stages of the settlement negotiations, yet Ms. Archangeli expressly asked that Liberty Mutual continue to negotiate toward a final settlement even though the search for records had not been completed.  LM Tab 29.  Scotts then decided to accept Liberty Mutual's settlement offer before the second Phase II search was completed.  LM Tab 43.

In regard to whether the statement was false, Scotts' argument assumes that everyone involved in the negotiations agreed on what constituted primary evidence and what constituted secondary evidence.  While witnesses were occasionally asked during their depositions whether certain specific items of evidence, such as loss runs, could constitute secondary evidence of the existence of policies, the parties have pointed to no uniform definition or

common understanding of the term.  Fine distinctions could be drawn.  For example, would primary evidence be confined to the actual paper documents of the original policy?  Would a Liberty Mutual policy number be primary evidence or secondary evidence of a policy?

There is no evidence that Ms. O'Brien, who is not an attorney, would have understood the phrase "any evidence" as being a reference to secondary evidence.  As the term "evidence" is generally used, an actual policy document could constitute "evidence" of the existence of that policy.

In arguing that Liberty Mutual would not have begun searching for evidence beyond actual policies at this point in time, Scotts relies on evidence concerning the two phases employed by Liberty Mutual for searching its records, referred to as Phase I and Phase II searches.  Alan Schlemmer of Liberty Mutual's Environmental Department described a Phase I search as a request to the library to find policies, and a Phase II search as trying to make every search which could be identified.  Scotts Ex. 94, Schlemmer Dep. pp. 192-194.  In this case, the Phase II search request was not distributed until April 22, 1999.  See LM Tab 5.

However, other evidence shows that Liberty Mutual's search prior to the Phase II search request would not have been confined solely to a search for policies.  The actual Phase I request form directed to the librarian includes the statement "DO YOU WANT RELATED MATERIALS?" with "Yes" and "No" boxes to check.  See LM Tab 2.  This indicates that the Phase I request is not limited to actual policy documents.  The "Yes" box was checked on forms sent in the Scotts matter on December 3, 1998, January 20, 1999, and March 3, 1999.  See LM Tabs 2-4.  In addition, the record includes

32

an e-mail from the Liberty Mutual policy librarian to Ms. O'Brien
dated October 14, 1998, <u>see</u> LM Tab 1, states:

> I was unable to locate anything in my search for O.M.
> Scott policies.  I searched our Stoughton database for
> anything containing Scott or equaling the serial number
> 010660.  Nothing came up.  I also contacted the Lewiston
> BPAP to see if they had any records.  They responded that
> they had no records after 25 years.

The librarian's e-mail does not state that the search was confined
to policies alone.  The e-mail states that the librarian was unable
to locate "anything" in the search for policies, that the database
was searched for "anything" containing "Scott" or the number
"010660," and that the Lewiston facility was contacted to see if
they had "any records."  The reference to "any records" suggests
that the search was not confined to actual policies.

In addition, a jury could not reasonably find that Ms. O'Brien
intended through the use of the phrase "any evidence" to
misrepresent the nature or scope of the search.  Ms. O'Brien's log
notes do not contain the term "secondary evidence," nor do they
purport on their face to give a report concerning the nature or
scope of the search being conducted at that point; they simply
state that nothing regarding Scotts had yet been found.  Ms.
O'Brien testified in her deposition that she did not recall having
any discussions with Ms. Archangeli concerning what searches had
been done or the Phase II search.  O'Brien Dep., pp. 73-77.

There is also evidence that Ms. O'Brien was never assigned to
the Scotts matter, that she was not involved in the actual search
for documents, and that she was just asked to respond to Ms.
Archangeli's letter of October 5, 1998.  O'Brien Dep. pp. 43-44,
70; Scotts Ex. 94, Schlemmer Dep. p. 213.  There is no evidence
that Ms. O'Brien had any information about the details or progress

of the Scotts search request other than the e-mail from the librarian quoted above, or that she intended to make any statement concerning the scope of the search. Even if she was thinking in terms of the scope of the search, Ms. O'Brien could have reasonably interpreted the e-mail she received from the policy librarian as referring to a search for other information as well as actual policies. A jury could not reasonably conclude from the evidence that she knowingly or recklessly misrepresented the nature of the search.

> 2. On March 5, 1999, representatives of Scotts, DRM, and Liberty Mutual met at Liberty Mutual's office in Dover, New Hampshire. Ms. Armstrong from Scotts, Ms. Archangeli from DRM, Mr. Merchant, the new claims adjuster at Liberty Mutual, and Terri Yahia, an in-house lawyer for Liberty Mutual, attended the meeting. During the meeting, Ms. Yahia told Scotts and DRM "that Liberty Mutual had not been able to find any evidence of policies that had been issued to Scotts." Armstrong Aff., ¶ 4,5, Ex. A-8 [Scotts Ex. 24].

Scotts argues that this statement gave the impression that Liberty Mutual had been searching for secondary evidence in March of 1999 when in fact the Phase II search request was not issued until April 22, 1999. See LM Tab 5. Again, there is no basis for a jury to find that this issue was material to the settlement. There is also no evidence that Scotts relied on the statements at the March 5th meeting, or that this reliance would have been reasonable. This meeting was held while the search for documents was still going on. Scotts provided additional information at the March 5th meeting which enabled Liberty Mutual to expand the list of names of Scotts affiliate companies which might appear as insureds. See Scotts Ex. 6 (6-11-99 letter of Mr. Merchant to Ms. Archangeli, stating that the search for documents was continuing).

Liberty Mutual continued its search for documents, expanded by the Phase II search dated April 22, 1999, which included a request to search for "ANY AND ALL documents." See LM Tab 5. Ms. Yahia eventually sent the documents relating to Scotts which were located in the search to Ms. Archangeli with her letter dated August 27, 1999.

As to whether the statement was false, Scotts' allegation argues for a narrow interpretation of Ms. Yahia's statement. There is no evidence that the phrase "any evidence of policies" would be understood by all involved in the negotiations as meaning only secondary evidence, that is, evidence other than the actual policy documents. The phrase "evidence of policies" could also refer to the actual policies, which would also be "evidence of policies."

Even assuming that the phrase "evidence of policies" was intended as a representation concerning the scope of Liberty Mutual's search up to that point, a jury could not reasonably find that this statement was false at the time it was made. As noted previously, the evidence shows that Liberty Mutual's Phase I search in this case encompassed more than a search for the actual policy documents. As of the meeting on March 5, 1999, three policy request forms dated December 3, 1998, January 20, 1999, and March 3, 1999, had been issued. See LM Tabs 2-4. Each of these forms contained the language "DO YOU WANT RELATED MATERIALS?" and the "Yes" box was checked. The term "related materials" is broad enough to encompass all types of evidence, not just the policies themselves.

    8. On or about August 13, 1999, Ms. Yahia spoke with Ms.
    Archangeli about the materials Ms. Yahia would be sending
    in her August 27, 1999, letter. Liberty Mutual misled
    Ms. Archangeli by representing that the materials

```
contained  nothing  significant  or  helpful.    Archangeli
Dep. at 334-335 [Scotts Ex. 83]; Armstrong Dep. at 852-
854 [Scotts Ex. 25].
```

Liberty Mutual correctly argues that the statement about the materials containing "nothing significant or helpful" was clearly one of opinion, not of fact.  There is no evidence that Ms. Yahia made the statement with the intent to mislead.  She sent the documents in question to Ms. Archangeli with her letter of August 27, 1999.  Ms. Archangeli was free to examine the documents and arrive at her own conclusion as to whether the documents were significant.  In fact, Ms. Archangeli testified that the 1999 loss run sent with the letter "just bolstered what we thought was the coverage" and agreed that it was just one more additional piece of evidence to support Scotts' view that there were policies.  LM Tab 9, Archangeli Dep. p. 342.

The evidence indicates that throughout the negotiations in question, Scotts had the assistance of its own experts.  Ms. Armstrong, Scotts' risk management director, had worked in the insurance area for over two decades, including working for insurance companies.  LM Tab 10, Armstrong Dep. pp. 956-57.  Ms. Archangeli is an attorney with DRM, a management consulting practice specializing in business-oriented settlements of environmental and insurance related disputes.  Doc. No. 167, Francisco Decl. Ex. D; LM Tab 33.  Since Scotts was represented in these negotiations by its own experts, no jury could reasonably conclude that this statement was material, or that Scotts justifiably relied upon it.

10. In her August 27, 1999, letter to DRM, Ms. Yahia stated that "Liberty Mutual did not locate any relevant

policies during its search." Aug. 27, 1999, Yahia
letter, Francisco Decl. Ex. U [LM Tab 7].

There is no evidence from which a jury could reasonably
conclude that this statement was false. Scotts has produced no
evidence that Liberty Mutual has ever found actual copies of any
policies of any kind for the relevant time period as a result of
its search. The letter refers to "policies," not secondary
evidence. The word "policies" could not reasonably have been
interpreted to include what could arguably be considered secondary
evidence because Ms. Yahia sent documents with her letter which
were found by Liberty Mutual and which arguably constituted
secondary evidence of policies.

> 24. On May 25, 2000, Ms. Armstrong from Scotts and Ms.
> Archangeli from DRM met with Liberty Mutual
> representatives in Boston. Mr. Merchant, Ms. Yahia and
> Bob Kostecki, a senior Liberty Mutual executive, attended
> the meeting on behalf of Liberty Mutual. During the
> meeting, the Liberty Mutual representatives stated that
> Liberty Mutual's own search for policies and secondary
> evidence of policies issued to Scotts had come up empty.
> Armstrong Aff. ¶ 6, Ex. A-8 [Scotts Ex. 24].

There is no evidence that Liberty Mutual ever located any
actual policies during its document searches. As to the statement
that Liberty Mutual's search for secondary evidence of policies
issued to Scotts had come up empty, the person who made the
statement is not identified by Ms. Armstrong in her affidavits.
See Scotts' Ex. 23, ¶ 4 and Ex. 24, ¶ 6. Even if the statement was
made, it is arguably a statement of opinion as to the sufficiency
of the secondary evidence to establish the existence of policies,
not a statement of fact. The fact that Liberty Mutual took a
different position during the negotiations on what would constitute

37

sufficient evidence to prove the existence of the liability policies and their terms is not sufficient to establish fraud. To the extent that Scotts argues that this statement was false in view of other evidence which came to light after the Release was executed, those arguments are addressed later in this opinion.

There is also no evidence from which a reasonable jury could conclude that the statement was material, that Scotts relied upon it, or that any reliance would have been justifiable. Liberty Mutual provided documents with Ms. Yahia's letter of August 27, 1999, to Ms. Archangeli which were found during its Phase II search and which arguably constituted secondary evidence of policies. DRM and Scotts were free to arrive at their own conclusion as to whether these materials constituted secondary evidence of policies.

> 27. Despite their conclusions at a May 8, 2000, internal meeting where Liberty Mutual personnel agreed that Liberty Mutual had insured Scotts under general liability policies and determined what year such coverage began, (citing Kostecki Dep. pp. 84-84 [LM Tab 39]; Yahia Dep. pp. 108-110 [LM Tab 27]) at a subsequent meeting with Scotts on May 25, 2000, Liberty Mutual denied finding policy information. Armstrong Aff., ¶6, Ex. A-8 [Scotts Ex. 24].

The citation to Ms. Yahia's deposition testimony does not support the proposition that Liberty Mutual representatives agreed that Liberty Mutual had insured Scotts under general liability policies. In her deposition, Ms. Yahia declined to state what determination she had made on the issue, stating that her role was to give a legal opinion on the likelihood that Scotts could meet its burden of proof establishing the existence of the policies. Scotts Ex. 27, Yahia Dep. pp. 108-110. She stated that all of the efforts which went into looking at the policies and evaluating information was for purposes of a settlement and not any kind of

agreement on coverage.  Id. p. 111.

The citation to Mr. Kostecki's deposition also fails to support the allegation that Liberty Mutual personnel agreed that Liberty Mutual had insured Scotts under general liability policies. At his deposition, Mr. Kostecki was asked if, during the internal meeting on May 8, 2000, at Liberty Mutual, he had "discussed the fact that Liberty Mutual or-that Scotts at least had had general liability from [Liberty Mutual] at some point," to which he responded, "Yes."  LM Tab 39, Kostecki Dep. p. 85.  This testimony does not establish that the Liberty Mutual representatives at the meeting also concluded that the "fact" referred to in the question was true or accurate.

In addition, the phrase "policy information" as used in Ms. Armstrong's affidavit is ambiguous.  There is no evidence that Liberty Mutual has ever found any actual policies.  Even assuming that the phrase "policy information" was intended by Ms. Armstrong to encompass all types of secondary evidence, Scotts could not reasonably have relied on that statement because Liberty Mutual had already provided documents found in its records as attachments to Ms. Yahia's August 27, 1999, letter which were arguably secondary evidence, and Scotts and DRM were able to independently evaluate whether those materials constituted secondary evidence in support of the existence of some policies.

> 33. During the 1998-2000 negotiations, in both telephone discussions and meetings, Liberty Mutual representatives repeatedly indicated that Liberty Mutual was not able to find policies or secondary evidence of policies that had been issued to Scotts for the '50s and '60s.  Archangeli Dep. p. 475 [Scotts Ex. 20]; Armstrong Aff., Ex. A-8 [Scotts Ex. 24] and Ex. A-26 [Scotts Ex. 23].

> 34. During the 1998-2000 negotiations, Liberty Mutual

representatives continued to dispute having found any secondary evidence that established general liability or public liability policies having been issued to Scotts. Archangeli Dep. pp. 479-480 [Scotts Ex. 83]; Armstrong Aff. Ex. A-8 [Scotts Ex. 24] and Ex. A-26 [Scotts Ex. 23].

35. During the 1998-2000 negotiations, Liberty Mutual representatives "consistently said that they didn't have anything." Archangeli Dep. at 479-480 [Scotts Ex. 83]; see also Armstrong Aff., Ex. A-8 [Scotts Ex. 24] and Ex. A-26 [Scotts Ex. 23].

The above allegations fail to comply with the requirement that fraud be alleged with particularity. They fail to identify the speaker and the time and place the statement was made. They also are repetitive of the allegations made in the preceding paragraphs, which have been addressed above.

38. In 2003, Scotts again directed inquiries to Liberty Mutual regarding Scotts' insurance coverage. (2-18-03 Armstrong letter, Ex. A-37). In a letter dated February 24, 2003, Liberty Mutual falsely represented that it had "conducted a policy search to determine if [it] issued any general liability policies" to Scotts, but that "[t]he policy search has not revealed any general liability policies issued to these companies by Liberty Mutual." 2-24-03 DiSisto letter, Ex. A-38 [Scotts Ex. 65].

This allegation concerns a statement which was allegedly made almost three years after the settlement release was signed. Thus, the statement could not have been relied on by Scotts in signing the release. In addition, there is no evidence that the statement is false. There is no evidence that Liberty Mutual has ever found copies of any actual policies which were issued to Scotts. There is also evidence that Liberty Mutual did in fact conduct a policy search. See LM Tabs 1-6 (relating to the Phase I and Phase II search requests). The statement refers to "policies," not evidence of policies. Both Liberty Mutual and Scotts were aware that some

40

documents which could arguably be considered secondary evidence of the existence of general liability policies had been found, and the above statement cannot reasonably be construed to encompass what was arguably secondary evidence which had been found by Liberty Mutual.

The above evidence relevant to the above allegations concerning Liberty Mutual's alleged representations concerning Liberty Mutual's inability to find policies or secondary evidence of policies is insufficient to present a genuine issue of fact in regard to fraud.

C. Policy and Claim Numbers

Scotts argues that Liberty Mutual representatives made misrepresentations concerning the meaning of policy numbers appearing on documents, and that they failed to disclose the significance of the codes present in those numbers:

> 3. In the course of the March 5, 1999, meeting, Liberty Mutual denied that the policy numbers were evidence of policies. Armstrong Dep. pp. 917-919 [Scotts Ex. 69].

Liberty Mutual denies that the above statement was made. Ms. Armstrong testified in her deposition that one of the Liberty Mutual representatives at the meeting (either Georges Prouty, Brian Merchant, or Terry Yahia; Ms. Armstrong did not recall specifically who made this statement) said that the policy numbers were not evidence of a Liberty Mutual policy. Scotts Ex. 80, Armstrong Dep. pp. 917-918. Liberty Mutual admits that if the statement was made, it was false. The numbers arguably constitute some evidence of the existence of Liberty Mutual policies, although policy numbers alone would not be sufficient to prove the existence, terms and conditions of those policies. For example, a policy number might be assigned to a policy which never went into effect because the premium was never paid.

41

Liberty Mutual argues that even assuming the statement was made, there is no basis for a jury to conclude that the statement was material. The numbers do not establish the exact terms of the policies, which were in dispute throughout the negotiations. The alleged statement concerning the policy numbers was made early in the negotiations. Before the settlement was executed, Scotts and DRM had several documents from which they could draw their own conclusions as to whether Scotts could make a viable argument that the policy numbers they had provided to Liberty Mutual were Liberty Mutual policy numbers. That information included an umbrella excess liability policy jacket on Liberty Mutual stationary, bearing policy number LE1-181-010660-097, which was obtained from Wausau and provided by Scotts to Liberty Mutual. LM Tab 11. Item 6 of that policy lists Liberty Mutual as being the underlying insurer for CGL (comprehensive general liability) policy number LP1-181-010660-077. That same policy number was used by Liberty Mutual to generate the GL 1999 loss run later provided by Liberty Mutual to Ms. Archangeli with Ms. Yahia's letter of August 27, 1999. LM Tab 7. Scotts also had a 1967 Liberty Mutual Insurance Schedule sent by William Marsh, Scotts' insurance manager, to Art Decker, an insurance agent for Liberty Mutual, by letter dated May 17, 1967, which referred to policy numbers LE1-181-010660-096 (umbrella excess) and LP1-181-010660-075 (comprehensive general liability). LM Tab 7. In view of the totality of the information that Scotts had prior to the settlement, including information concerning the policy numbers, it would have been unreasonable for Scotts to rely on the alleged statement that these policy numbers were not evidence of policies.

There is also evidence that Scotts did not rely on this statement, but rather continued to assert the position throughout

the negotiations process that the policy numbers were Liberty Mutual
numbers and that Liberty Mutual had issued liability policies to
Scotts in the 1950s and 1960s.  For example, by letter dated March
23, 2000, to Mr. Merchant, Ms. Archangeli provided Liberty Mutual
with premium invoices on Liberty Mutual stationary, including: 1)
two invoices for policy number LP1-181-01-660-075, a three-year
comprehensive general liability policy in effect from 10-1-65 to 10-
1-68; 2) one invoice for policy number LE1-181-010660-095 in effect
from 10-1-65 to 10-1-66; and 3) one invoice for umbrella excess
policy number LE1-010660-097 in effect from 10-1-67 to 10-1068.  See
LM Tab 12.

> 4. In the course of the March 5, 1999, meeting, Scotts
> discussed the Umbrella Excess Liability Policy that
> Scotts had located with the "P" claim numbers listed on
> the back.  Liberty Mutual denied that the claim numbers
> attached to the umbrella policy were Liberty Mutual claim
> numbers.  Armstrong Aff. ¶ 5 (Ex. A-8) [Scotts Ex. 24];
> Armstrong Dep. p. 931 [Scotts Ex. 69]; Archangeli contact
> notes for Georges Prouty (Francisco Decl. Ex. TT)[Scotts
> Ex. 48].

> 25. During the May 25, 2000, meeting, the Liberty Mutual
> representatives repeated the representations that the
> claim numbers attached to the Umbrella Excess Liability
> policy were not Liberty Mutual claims.  Archangeli Dep.
> pp. 222-224 [Scotts Ex. 83]; Armstrong Aff. ¶ 6, Ex. A-8
> [Scotts Ex. 24]; June 2004 e-mail chain, Ex. A-22.

> 26. On November 4, 1999, Georges Prouty from Liberty
> Mutual misrepresented that "P" just indicates liability
> policies" and that he did not "know what type of
> liability policies."  Archangeli contact database notes
> for Georges Prouty, Ex. A-27 [Scotts Ex. 48]; Prouty Dep.
> pp. 104, 147-149 [Scotts Ex. 93].

> 29.  At a meeting on May 25, 2000, Liberty Mutual
> representatives recanted Mr. Prouty's statements.
> (citing Archangeli Dep., p. 223 [Scotts Ex. 71];
> Armstrong Dep. pp. 981-982 [Scotts Ex. 70]). At the
> meeting held on May 25, 2000, Liberty Mutual returned to
> its prior position that the claim numbers "were not

Liberty Mutual claim numbers." Archangeli Dep. p. 224 [Scotts Ex. 71]; Armstrong Dep. pp. 938-939; 981-982 [Scotts Ex. 80].

The above allegations address Liberty Mutual's alleged statements in regard to the claim numbers listed on documents connected with the umbrella excess liability policy bearing policy number LE1-181-010660-097. Scotts also alleges in the first amended complaint that at a meeting held in Liberty Mutual's office in Dover, New Hampshire, attended by Mr. Merchant and Ms. Yahia, "Liberty Mutual" denied that any of the open claim numbers attached to the umbrella excess liability policy were Liberty Mutual claim numbers. Amended Complaint, Paras. 15-17.

The evidence on this point is conflicting. Ms. Armstrong testified that at the March 1999 meeting, Ms. Yahia stated that the claim numbers were not Liberty Mutual claim numbers. Scotts Ex. 80, Armstrong Dep. p. 931; see also Scotts Ex. 24, Armstrong Aff. ¶ 5 (Ms. Yahia said she did not recognize the claim numbers and that they were definitely not Liberty Mutual claim numbers). At one point, Mr. Prouty stated that the claim numbers which began with the letter "P" were Liberty Mutual claim numbers, but he further stated that he wasn't sure what type of liability insurance was indicated by the "P" designation. Id. at 935-938. The telephone log of Ms. Archangeli also notes a conversation with Mr. Prouty on November 14, 1999, during which he stated that the claim numbers were Liberty claim numbers printed on Liberty letterhead, and that the "P" just indicated liability policies, he did not know what type. Scotts Ex. 48. See also Scotts Ex. 44, Prouty Dep. pp. 148-149.

There is also evidence that at the May 2000 meeting, Ms. Yahia stated that the claim numbers were not Liberty Mutual claim numbers;

44

however, Mr. Prouty was not at this meeting and never retracted his own statement. Scotts Ex. 80, Armstrong Dep. pp. 937-938, 983-984. Ms. Archangeli testified at her deposition that Ms. Yahia "was a little bit equivocal" about the claim numbers. Scotts Ex. 83, Archangeli Dep. p. 223. In a letter to Mr. Kostecki dated May 26, 2000, Ms. Archangeli stated, "While Terry [Yahia] was not sure that the claim numbers listed were actually Liberty Mutual claim numbers, Georges Prouty was unequivocal in his statement that the claim numbers listed on these sheets are actually old Liberty claim numbers." LM Tab 13.

However, at the oral hearing on Liberty Mutual's motion for summary judgment held on May 2, 2008, counsel for Scotts indicated that Scotts was no longer relying on the "P" claim representations as a basis for its fraud claim. See Scotts Ex. 90, p. 30. In addition, in light of the evidence that Scotts was aware of Mr. Prouty's opinion that the claim numbers were Liberty Mutual numbers, a trier of fact could not reasonably find that Scotts reasonably relied on any statement made by Ms. Yahia to the contrary.

Scotts now contends that although Liberty Mutual admitted that the "P" claims were Liberty Mutual claims, Scotts was misled because Liberty Mutual did not admit that the "P" claims were general liability claims. Scotts cites the testimony of Mr. Prouty. However, Mr. Prouty simply testified that the "P" claims were liability claims, but that he did not know what specific type of liability policy or claim was indicated by the letter "P". Scotts Ex. 93, Prouty Dep. p. 149; LM Tab 37, Prouty Dep. p. 64. There is no evidence that Mr. Prouty's statement about the extent of his knowledge was untrue. There is also evidence of some disagreement among Liberty Mutual employees as to their understanding of the

45

meaning of the letter "P". Kim Olson of Liberty Mutual testified that "P" claims were general liability claims. Scotts Ex. 101, Olson Dep. p. 136. However, Mr. Schlemmer testified that while "P" generally means public liability, the records in question involved older manual data which was converted into an automated environment, and that "P" was a claim letter which could be used with a claim against a policy other than a general liability policy, particularly with older pre-computerized data. Scotts Ex. 94, pp. 103-104, 116-117.

Even assuming that "P" refers to general or public liability claims, Liberty Mutual persuasively argues that any failure to state the meaning of the letter "P" was not material because Scotts and DRM had documents in their possession which indicated that the letter "P" was used to refer to public or general liability claims. For example, the policy number LP1-181-010660-077, referred to as a CGL (comprehensive general liability) policy by Ms. Archangeli in her October 5, 1998, letter to Ms. O'Brien, LM Tab 11, also appears in the 1999 loss run, LM Tab 7, provided to DRM by Ms. Yahia. The 1999 loss run indicates that it is a "GL" (general liability) loss run, and it includes over two pages of claim numbers preceded by the letter "P". A document entitled "Item 6 - Extension Schedule" sent with Ms. Archangeli's letter of October 5, 1998, also refers to "CGL LP1-181-010660-077." LM Tab 11. Also included with Ms. Archangeli's letter were documents from Scotts' records which contained the heading "PUBLIC LIABILITY" followed by lists of open claims with claim numbers preceded by the letter "P". LM Tab 11. Several of the "P" claim numbers which appear on Scotts' lists of open public liability claims for the period from 1965 to 1966 also

46

appear on the 1999 loss run.[2]

There is also no merit to the argument that knowledge of the "P" numbering system was material because it was needed to understand the claim logs which were found in Scotts' records years after the settlement was executed.  <u>See</u> LM Tab F.  Since these claim logs were discovered in Scotts' own storage facility after the settlement was negotiated, those documents played no role in the settlement negotiations, and Scotts' ability to interpret the significance of the "P" code used in those documents was not material to the settlement.  In addition, Scotts did not need to know the meaning of the letter "P" to determine the nature of the claims on the logs.  The first two pages bear the headings "LIABILITY LOSS OTHER THAN AUTO, PRODUCTS AND WORKMENS COMPENSATION" and "LIABILITY CLAIMS RECORD (Other than Auto and Products)," but these pages do not contain any claim numbers to decipher.  The logs include several pages of product liability claims with no claim numbers.  The logs also contain pages entitled "GENERAL LIABILITY UNIT REPORT" which have "P" claim numbers.  However, in these pages, the nature of the "P" claim is apparent from the heading, that is, "general liability."

Scotts also argues that it was a material omission on the part of Liberty Mutual to fail to reveal the manner in which information was coded into Liberty Mutual policy numbers.  For example, for the umbrella excess policy identified by Scotts as policy number LE1-181-010660-097, "LE" is the type of policy (liability excess), and the number "1" indicates the company which issued the policy (Liberty Mutual).  Scotts Ex. 41, Olson Dep. p. 85.  The digits

_____

[2]<u>See</u> claim numbers P440-0160490, P465-021071, P478-005473, P306-010918, P306-011640, P413-001821, P555-010169, P813-003332, and P813-003397.

"181" identify the policy as "1" a business market risk, "8" the division from which the policy was written, and "1" the production office which produced the policy. Id. p. 86. The number "010660" is a policy holder number assigned to Scotts. Id.[3] In the last three digits of the policy number "097," the "09" indicates that this was the ninth policy of some type issued to this insured, and the "7" is the year the policy was issued (of an unspecified decade; that is, the decade cannot be determined from this number). Scotts Ex. 41, Olson Dep. p. 87; Scotts Ex. 40, Jerry McCullough Dep. pp. 42-43.

Scotts notes in particular the coding which indicates the numbers of policies which were sold to Scotts. There is no evidence which indicates how this information would have assisted Scotts in finding additional liability policies or secondary evidence of coverage. The evidence shows that while the second-to-last number indicated that previous policies were issued to Scotts, it does not reveal the types of policies which were issued. In the above example, the previous eight policies could have been policies other than general or excess liability policies. There is evidence Scotts had prior to the execution of the Release which shows that Liberty Mutual may have issued other types of policies to Scotts which were not general liability policies. This evidence includes the automobile claims sent by Ms. Archangeli to Ms. O'Brien with her

_____

[3]However, the record shows that this was not the only policy holder number assigned to Scotts over the years. At some point, Liberty Mutual updated its numbering system and renumbered clients. Scotts Ex. 88, Jerry McCullough Dep. p. 42. For example, the policy number on a claim log which was found by Scotts in its own records and used by Liberty Mutual to generate the 2007 loss run, 1-181-906485-022-92, included a different client identifier, "906485." See Scotts Ex. 33; LM Tab A, Ivan Smith Dep. p. 63. The directors' and officers' liability policies sold to Scotts by Art Decker in 1967 were numbered RE1-181-100044-27 and RH1-181-100045-27, and also included different client identifiers, specifically, "100044" and "100045." See Doc. No. 167, Ex. U.

letter of October 5, 1998, LM Tab 11, and the automobile claims included with the August 14, 1998, letter sent by Ms. Armstrong to Liberty Mutual, Scotts Ex. 1, which suggest that Liberty Mutual issued automobile policies to Scotts. In addition, the Liberty Mutual insurance schedule sent to Art Decker by William Marsh on May 17, 1967, indicates that Liberty Mutual may have issued workers' compensation, employee benefits liability, advertiser's liability and automobile liability policies and a blanket crime policy to Scotts. See LM Tab 7. There is no evidence which suggests that if Scotts had been fully aware of the coding system, this would have provided Scotts with any more information than it already had concerning possible liability coverage from Liberty Mutual.

The evidence concerning the alleged statements or omissions regarding the policy and claim numbers is insufficient to show that the coding of policy numbers deprived Scotts of material information, or to create a genuine issue of fact on Scotts' fraud claim.

D. Search for Policies and Secondary Evidence

Scotts argues that Liberty Mutual made false statements concerning the search of its records for policies issued to Scotts and secondary evidence of policies.

> 5. On April 27, 1999, after learning that Liberty Mutual's Phase II search had not yet commenced, Mr. Merchant nonetheless assured DRM that Liberty Mutual's search for "any information or policies that may have been issued to Scotts or entities of Scotts by Liberty Mutual" was "continuing"–further misleading Scotts and DRM into believing that Liberty Mutual had been actively searching for secondary evidence all along. April 27, 1999, Merchant letter, Ex. A-12 [Scotts Ex. 8].

> In his letter of April 27, 1999, to Ms. Archangeli, Mr.

49

Merchant noted that in their conversation of April 12, 1999, he advised her "that Liberty Mutual's search for any information or policies that may have been issued to Scotts or entities of Scotts by Liberty Mutual is continuing." Scotts Ex. 8. Scotts alleges that this statement was misleading because it gave the impression that Liberty Mutual had been searching for secondary evidence of policies all along. This is a strained interpretation of the language in the letter. The cited language referred to "any information or policies" in the alternative; there is no evidence to refute the fact that Liberty Mutual had initiated searches for policies, and that those searches were continuing.

In addition, the record contains evidence that prior to Mr. Merchant's letter, Liberty Mutual had in fact been searching for secondary evidence as part of the Phase I search. On December 3, 1998, a policy request form for all liability policies issued to O.M. Scott and Sons Company, and specifically listing policy numbers LE1-181-010660-097 and LP1-181-010660-077, was sent to the librarian. LM Tab 2. A supplemental policy request form dated January 20, 1999, was sent which named additional business entities as possible insureds and adding policy number LG1-621-004092-033 and the notation "Public Liability back to 1958." LM Tab 3. A second supplemental policy request form was sent on March 3, 1999, after Scotts provided some additional names for insureds. LM Tab 4. Each of those forms contained the query "DO YOU WANT RELATED MATERIALS" and the "Yes" box was checked on each of those forms. These request forms show that the requested search was broad enough to encompass secondary evidence and not just the actual policies.

There is evidence that Mr. Merchant knew on April 27, 1999, that the Phase II search had begun. The record contains a Phase II

search request sent by e-mail on April 22, 1999. LM Tab 5. This was prior to Mr. Merchant's letter of April 27, 1999, and Mr. Merchant was copied on the e-mail. Thus, the evidence indicates that Mr. Merchant was informed about the launching of the Phase II search request. He obviously would not have been aware of that request prior to the phone conversation of April 12, 1999, referred to in the letter. However, that fact does not render false Mr. Merchant's statement that the search for information was "continuing;" there is evidence that it did in fact continue. See LM Tab 5. There is no evidence that at the time of the phone conversation, Mr. Merchant believed that the search had concluded and falsely represented that it was continuing.

Mr. Merchant later clarified his statement in a letter dated June 11, 1999, by indicating that "portions of our search for certain policy information only recently began." LM Tab 18. He noted that at the March 5, 1999, meeting and in a letter dated March 19, 1999, Scotts provided additional information regarding potential named insureds which required Liberty Mutual to expand its search criteria. Id. Ms. Yahia eventually provided the results of the Phase II search to Scotts with her letter dated August 27, 1999. LM Tab 7.

There is also no evidence from which a jury could reasonably conclude that Scotts relied on Mr. Merchant's statements. Even assuming that there were no searches for secondary evidence prior to the letter, there is no evidence to show that this fact was critical to the negotiations. The statement was made early in the negotiations, at a time when Scotts could reasonably anticipate that additional searches for secondary evidence would be undertaken, and the broader Phase II search was initiated shortly before Mr.

51

Merchant's letter.   As late as June of 2000, Ms. Armstrong requested another policy search.   Mr. Kostecki agreed with this request and asked Mr. Merchant by memo dated June 5, 2000, to do another search for policies.   LM Tab 28.   Scotts was aware of all of this prior to the settlement.

> 16. On December 6, 1999, Mr. Merchant sent a letter stating that Liberty Mutual "initiated and completed an internal search of its records for all policies that were issued or may have been issued to O. M. Scotts."  Dec. 6, 1999, Merchant letter, Ex. A-21 [Scotts Ex. 9].

There is no evidence that Liberty Mutual ever found any actual policies of any type which had been issued to Scotts or any Scotts entity.   However, Scotts argues that these statements imply that Liberty Mutual searched its records for all policies which may have been issued to Scotts, not just liability policies.   The above reference to "all policies" was qualified in the letter, where Mr. Merchant further stated that "our internal search has not located any primary or excess liability policies of insurance issued to O.M. Scotts or any of its entities."  Scotts Ex. 9.   The statements also refer to "policies," not "evidence of policies."

There is also evidence that Liberty Mutual did initiate and complete an internal search which was broad enough to include other types of policies which might contain information concerning liability policies.   The record includes three policy request forms dated December 3, 1998, January 20, 1999, and March 3, 1999, for all liability policies issued to O.M. Scott and Sons Company, and specifically listing policy numbers LE1-181-010660-097 and LP1-181-010660-077.   See LM Tabs 2-4.   The first form requested a search for all liability policies for all years, noted the two policy numbers which had been provided by Scotts, and also stated: "Please search

52

for any and all policies pertaining to the above-captioned insured. Please do not limit your search to the policies mentioned above. Please search for other policies." LM Tab 2.

Scotts argues that Liberty Mutual did not search for all policies, but rather confined its search to liability policies. On the forms in question, the box for "All Liability Policies/All Years" was checked, while the box for "Other" was not. However, as indicated above, the first form also stated, "Please search for any and all policies pertaining to the above-captioned insured. Please do not limit your search to the policies mentioned above. Please search for other policies." LM Tab 2. In addition, Ms. Chartrand testified that when no general liability policies were found, it was standard practice to look at other types of coverage such as workers' compensation and automobile coverage to see if they contained references to general liability policies. Scotts Ex. 84, Chartrand Dep. pp. 31-33. The record also contains a broad Phase II search request which was sent by e-mail on April 22, 1999, and completed prior to Mr. Merchant's letter. See LM Tab 5. As will be discussed more fully below, this Phase II request asked for "ANY AND ALL" documents pertaining to Scotts and its related entities.

The above statements in Mr. Merchant's letter concerning Liberty Mutual's search for policies do not raise a genuine issue of material fact in regard to Scotts' fraud claim.

E. Disclosure of Documents

11. In her August 27, 1999, letter to DRM, Ms. Yahia stated that "[o]f the located documents [Liberty Mutual was] withholding only documents related to reinsurance" and that "[t]he withheld documents relate to Directors' and Officers' coverage and do not contain any information relating to general liability coverage." Aug. 27, 1999, Yahia letter, Francisco Decl. Ex. U [LM Tab 7].

15. In her October 28, 1999, letter to Ms. Archangeli, Ms. Yahia stated that although Liberty Mutual was "under no obligation to do so, we provided you with all relevant documents that were located during that search."  Oct. 28, 1999, Yahia letter, Ex. A-25 [Scotts Ex. 57].

The record includes documents which accompanied the August 27th letter.  Francisco Declaration, Doc. No. 167, Ex. U.  The documents in this exhibit include: 1) a 1999 loss run for GL policy number 181-010660-07, from 10-1-65 to 10-1-67; 2) a file related to directors' and officers' liability insurance sold by Art Decker to Scotts from 1967 to 1970, including the letter from W.N. Marsh to Art Decker dated May 17, 1967, and a Liberty Mutual insurance schedule; and 3) an undated extension schedule relating to policy number LP-1-181-010660-075 naming O.M. Scott and Sons Company and other business entities as insureds.

Scotts argues that Liberty Mutual did not provide Scotts with all relevant documents but rather withheld material information.  As the following analysis demonstrates, the evidence on this point is insufficient to raise a genuine issue of material fact as to Scotts' fraud claim.

1. Documents Relating to Reinsurance

Ms. Yahia indicated she was withholding certain documents related to reinsurance relating to directors' and officers' coverage.  Other than Ms. Archangeli's conclusory statement during her deposition that the reinsurance information would confirm that the Scotts' policies went back to the 1950s, see Archangeli Dep., p. 336, there is no evidence that the information concerning reinsurance, which related to reinsurance for directors' and officers' liability policies, would have led to additional information concerning general or umbrella liability coverage.  The

portion of the file relating to officers' and directors' coverage which was produced to DRM indicates that the officers' and directors' liability policies were issued between 1967 and 1970. The only relevant information found in those records was Mr. Marsh's 1967 correspondence with Art Decker listing the insurance coverage Scotts had through Liberty Mutual at the time, and those documents were produced to DRM.

## 2. Documents from the Phase II Search

The record includes e-mails dated May 11, 1999, to and from Ms. Yahia and Ms. Chartrand concerning the results of the Phase II search. Scotts Ex. 78. In her e-mail, Ms. Chartrand stated that she received four affirmative responses, including: 1) a one-page business sales report indicating payment to sales representatives for policies during 1969 for Scotts from Home Office Financial; 2) workers compensation underwriting reports for Sierra Chemical Co. from 12-1-87 to 12-2-88, and Grace Sierra Horticultural Products Co. from 12-1-88 to 12-1-94 from Lewiston Distribution; 3) five boxes with unidentified contents from the Stoughton storage warehouse; and 4) information from Boston Reinsurance concerning two boxes of O.M. Scott & Sons materials, one box related to the Burpee Company, and one box related to Consolidated Warehouse package. Ms. Yahia responded to Ms. Chartrand by stating that she wanted to see the relevant documents Ms. Chartrand had found. The record also contains a memorandum from Ms. Chartrand to Ms. Yahia dated May 13, 1999, indicating that she was forwarding the one-page business sales document, workers compensation underwriting reports for Sierra Chemical and Grace Sierra Horticultural Products and a folder of credit information for Scotts. Scotts Ex. 77.

Ms. Yahia testified in her deposition that any credit documents

relating to Scotts would have been produced unless they related to reinsurance. Yahia Dep. pp. 250-260. She states that everything that was relevant was produced to DRM. Id. p. 262. She testified that if the underwriting reports for Sierra Chemical and Grace Sierra were not produced, they must not have been relevant. Id. The e-mail indicates that the reports related to workers' compensation insurance from 1987 to 1994, and there is no evidence that anything in them was relevant to Scotts' search for liability policies in the 1950s and 1960s. Ms. Yahia further testified that while she did not recall what was in the documents mentioned in the memorandum, any Scotts-related documents were provided to Ms. Archangeli. Id. p. 266.

Scotts complains that the 1999 loss run was sent to Ms. Yahia on May 13, 1999, but not disclosed to DRM until the letter of August 27, 1999 (although the loss run was discussed in a telephone conference on August 13, 1999, between Ms. Yahia, Ms. Archangeli, and possibly Ms. Armstrong, see LM Tab G, Armstrong Dep. pp. 852-54; LM Tab 9, Archangeli Dep. pp. 341-42). However, Scotts points to no evidence indicating why this delay was detrimental to Scotts, since the loss run was disclosed to Ms. Archangeli long before the settlement. In addition, Ms. Archangeli testified that the loss run "just bolstered what we thought was the coverage." Archangeli Dep. p. 344.

Scotts notes the one-page document entitled "BUSINESS SALES EARNINGS - MASTER FILE UPDATES" dated December, 1989, which was produced by Liberty Mutual in the California litigation involving Scotts and ITT. LM Tab K. This document shows business sales earnings from Scotts received in January (two entries) and June of 1969. The nature of the policies which generated the income is in

56

code.   Although  the  record  is  not  clear,  this  document  may
correspond to the one-page business sales document mentioned in Ms.
Chartrand's May 13, 1999, memorandum to Ms. Yahia.  Scotts Ex. 77.
Ms. Yahia did not recall the document mentioned in the memorandum,
and reiterated that everything which was related to Scotts was
produced.  Yahia Dep., pp. 266-267.  Although Scotts contends in its
May 20, 2008, memorandum, Tab 1, p. 6, that this document was not
disclosed, no evidence is cited in support of this statement.

    Assuming arguendo that Ms. Yahia was aware of this document in
1999 and did not give it to Scotts or DRM, Liberty Mutual argues
that the business sales earnings document is not material because
the entries on the earnings report related to Scotts were for 1969,
beyond the 1958-1968 time period included in Scotts' settlement
proposal.  See Doc. No. 167, Francisco Decl. Ex. B.  Scotts'
Allocation to CGL Insurers.  The evidence also reveals that in a
letter dated March 23, 2000, Ms. Archangeli sent Mr. Merchant copies
of premium invoices, including: 1) an invoice dated January 13,
1967, for policy number LP1-181-010660-075 (a three-year policy);
2) an invoice dated January 13, 1967, for policy number LE1-181-
010660-095; 3) an invoice dated January 7, 1969, for policy number
LE1-181-010660-097, with the notation "Umbrella Excess Liability";
and 4) and invoice dated January 7, 1969, for policy number LP1-181-
010660-075, with the notation "Comprehensive General Liability."
LM Tab U.  The date on the umbrella excess invoice corresponds with
the January 1969 entry on the business sales earnings report for
policy number "09".  To that extent, the information in the report
is cumulative of information already in Scotts' possession.  Scotts
argues that earnings entered in the "PRIOR YRS" column indicated
that the policy was in effect prior to 1969, but Scotts had

57

information to that effect already, since the Marsh letter and the premium invoices dated January 13, 1967, indicated that Scotts had liability policies with Liberty Mutual as early as 1967.

As to the other two entries on the business sales report, the date on the invoice for comprehensive general liability is consistent with the other January 1969 entry, but the policy number "05" does not correspond. There is no evidence that the earnings reflected in these two entries relate to the sale of liability policies. This report is insufficient to create a genuine issue of fact on the issue of materiality for purposes of Scotts' fraud claim.

3. 2006 Loss Run

Scotts also contends that the information on the 2006 loss run produced in the California litigation, LM Tab L, was not disclosed to Scotts prior to the settlement. This loss run includes automobile claims made against automobile policies in effect from 1963 to 1967, liability claims made against policy numbers 1-181-010660-075 and 1-181-010660-077 in effect as of 10/1/65 and 10/1/67, and asbestosis claims made against policy number LE1-181-010660-097 in effect from 1/01/67 to 10/1/68.

The portion of the 2006 loss run which relates to general liability policy numbers 1-181-010660-075 and 1-181-010660-077 corresponds to the loss run which was produced in 1999 and sent to Ms. Archangeli with Ms. Yahia's letter of August 27, 1999. See LM Tab D.

Another portion of the loss run reports sixty-one asbestosis claims made against policy number LE1-181-010660-097, effective 1/10/67. That is the number on the umbrella excess policy sent to Liberty Mutual by Ms. Archangeli with her letter of October 5, 1998.

58

See LM Tab E.  All of these claims list an "Accident Date" of 9/30/68, which is the day before the policy expired.  Neither party specifically discusses these claims in the briefs.  The loss run does not state when these claims were filed, and the parties have pointed to no evidence that these claims were filed prior to 1999, or that anyone involved in the Scotts negotiations was aware of these claims.  The evidence does not indicate that this portion of the loss run was or could have been generated at the time of the Scotts negotiations.

There is also no evidence that this information was material. DRM was retained by Scotts to pursue a lump-sum cash settlement from Scotts' historic insurers to defray the cost of environmental claims.  First Amended Complaint, ¶¶ 8-10.  It wasn't until 2003, after the settlement, that civil actions were filed against Scotts seeking compensation for asbestos-related injuries.  First Amended Complaint, ¶ 27.  It is possible that the asbestos claims reported in the loss run were filed after 2000 in connection with those suits.  In addition, a jury could not find that the failure to produce this information was material in light of evidence that Liberty Mutual was willing to give Scotts settlement value for the excess umbrella policy for the time period reflected in the 2006 loss run.  See LM Tab 13 (May 26, 2000, letter from Ms. Archangeli to Mr. Kostecki stating her understanding that Liberty Mutual's offer was based on "one liability and umbrella policy to Scotts from 1967-1968.").

The 2006 loss run also includes claims against automobile policies with effective dates from 10/1/63 to 10/1/67.  Scotts Ex. 92, Olson Dep. p. 105.  Scotts argues that this portion of the loss run, which was not previously disclosed to Scotts, was material,

citing the deposition testimony of Kim Olson in the California litigation. Scotts alleges that Ms. Olson admitted in her testimony that Liberty Mutual had insured Scotts in the 1950s and 1960s. In fact, Ms. Olson was asked if she would agree that the 1999 loss run "constitutes secondary evidence that there was-there were, in fact, policies issued to O.M. Scott?" to which she replied, "It could be secondary evidence." LM Tab J. This does not constitute an admission of coverage or the existence of liability policies.

Liberty Mutual also argues that the automobile claims portion of the loss run was not material to the settlement negotiations, and that, in any event, Scotts had sufficient information prior to the settlement indicating that Liberty Mutual may have issued automobile insurance policies to Scotts during the 1950s and 1960s. There is no evidence that any of the automobile claim information on the loss run would have led to any new information about liability coverage.

The evidence reveals that prior to the settlement, Scotts was aware of evidence that Liberty Mutual may have issued automobile policies to Scotts. Two of the automobile policies included in the loss run are 1-181-010660-17 and 1-181-010660-36. These numbers correspond with the numbers for the automobile liability policies contained in the Liberty Mutual insurance schedule attached to the May 17, 1967, letter sent by William Marsh to Art Decker, which was disclosed in Ms. Yahia's August 27, 1999, letter to Ms. Archangeli. See LM Tab 7.

Ms. Armstrong also sent information from Scotts' records with her letter to Liberty Mutual dated August 14, 1998. LM Tab P. This information included data relating to automobile claims dated from 1962 to 1967 on Liberty Mutual forms. One of these documents referred to policy number AE1-181-010660-036, and some of the

information on the automobile claim documents with the heading "AUTOMOBILE LIABILITY" OR "AUTOMOBILE" noted "A" claim numbers. In addition, several of the "A" claim numbers on the loss run are also noted in the lists of automobile claims from Scotts' records which were sent by Ms. Archangeli to Ms. O'Brien with her letter dated October 5, 1998. <u>Compare</u> LM Tab E and LM Tab L.[4] The claims on Scotts' lists included claims made from 1959 to 1966. Thus, documents from Scotts' own records showed automobile claims being filed over a broader period of time than the dates reflected in the loss run, and suggested the existence of automobile insurance coverage during that period of time.

Based on the evidence in the record, a jury could not reasonably find that the loss run information concerning automobile liability policies was material, or that Liberty Mutual deliberately concealed this information from Scotts with the intent to mislead. Scotts had information prior to the settlement which revealed automobile policy numbers, claim information, and years of possible automobile coverage dating back to 1959. The fact that Scotts may have had automobile policies with Liberty Mutual does not necessarily mean that Scotts also had general liability coverage during that same period. There is no evidence indicating that if Scotts or DRM had been provided with the portion of the loss run relating to automobile claims prior to the settlement, the loss run would have led to the discovery of other information concerning general or umbrella liability insurance coverage. Scotts had

---

[4]<u>See</u> claim numbers A471-021240 to -021243, A209-147394 to -147396, A334-083449 to -083452, A465-031034 to -031037, A440-048949, A448-032136, A440-049485, A850-001466, A813-007917, A668-010419 and -010420, A813-007872, A205-021465, A443-034893, A111-077020 and -077021, A813-005974, A668-008351 to -008354, A541-024716, A604-003599, A813-006355 and -006356, A220-0057438, A813-006952, A440-047431, A209-147394 to -147397, A896-008422 and A896-008441.

automobile policy numbers prior to the settlement, but there is no evidence that Scotts ever asked Liberty Mutual to do a loss run based on these policy numbers prior to the settlement.

The 2006 loss run produced in the California litigation is cumulative of other information which was in Scotts' possession, and a jury could not reasonably find based on the evidence that material information was withheld from Scotts. The 2006 loss run does not raise a genuine issue of material fact in regard to Scotts' fraud claim.

4. 2007 Loss Run

Scotts also notes that Liberty Mutual failed to produce the information contained in the 2007 Loss Detail Report dated 2/6/07 prior to the negotiation of the release. This loss run, LM Tab R, showed paid losses for O.M. Scott related to policy number 1-181-906485-022, with effective dates spanning from 10/1/59 through 10/1/64, and claims filed from 1960 to 1965. Scotts argues that the fact that Liberty Mutual was able to produce this loss run in 2007 suggests either that Liberty Mutual representatives concealed this information or that they lied when they stated that a diligent company-wide search had been conducted.

Scotts points to no evidence that Liberty Mutual representatives handling the Scotts matter were aware, during the settlement negotiations, of the information in this loss run or the policy number used to generate it. There is unrefuted evidence that the policy number used in the loss run was produced by Scotts to Liberty Mutual after Scotts found, in its own records, a handwritten claim log with claims dating from 1950 to 1970, including general liability unit reports. See LM Tab F, Claim Log; LM Tab A, Ivan Smith Dep. pp. 62-63, 73-75. There is no evidence that Liberty

62

Mutual representatives knew about the information in the claim log or general liability unit reports during the negotiations. Ms. Olson testified that the 2007 loss run was not produced to Scotts prior to August of 2000 "because Scotts did not inform Liberty Mutual until this litigation of this account number, which we had found no record of." LM Tab BB, Olson Dep. p. 57. Mr. McCullough, who worked for Liberty Mutual for forty years, testified that at some point, Liberty Mutual had upgraded its numbering system and had renumbered clients. Scotts Ex. 88, McCullough Dep. pp. 10, 42. This evidence supports Liberty Mutual's contention that it was not aware of the older policy numbers with the different client identifier for Scotts.

Scotts argues that the information in the 2007 loss run should have been discovered by Liberty Mutual through a computer search. Scotts notes Liberty Mutual e-mails dated March 15, 2000, and November 13, 1998, concerning instructions for using the revised computerized A.R. (aggregate remaining) System export feature for obtaining loss runs. LM Tab 21. These e-mails indicate that it is possible to complete a loss run in A.R. using the insured name, policy number, serial number or account number. However, the same documents indicate that lost policies were not included in the A.R. system; lost policies such as the older policies Scotts was looking for in this case had to be retrieved from a separate system known as I.S. Id. It was an I.S. search request noting policy number LP1-181-010660-077, see LM Tab AA, which resulted in the 1999 loss run, LM Tab 7. In addition, Ms. Chartrand testified that while it was currently possible to generate a loss run off of the A.R. database using the name of the insured, she never did it because it was too restrictive; the search required the six-digit account

number.   Scotts Ex. 84, Chartrand Dep. pp. 52-53.

Ms. Olson testified that name searches were possible in A.R. for newer policies, but that for older policies, "oftentimes we need the account number." Scotts Ex. 92, Olson Dep. pp. 58-59. She also testified that the A.R. system used by CERC (the Liberty Mutual environmental department) and all department systems that handle any loss data have now been consolidated through the data warehouse, a Liberty Mutual corporate database, thereby giving CERC access to loss data maintained by other departments. LM Tab BB, Olson Dep. pp. 42-44. However, this consolidation did not occur until the early 2000s. Id. p. 45. Prior to consolidation, if anyone wanted to get information such as that contained in the 2007 loss run, a manual request was made to the information systems group. Id. at pp. 48-49. Manual requests were made by Liberty Mutual in 1999 in regard to the Scotts matter. See LM Tabs 5 and 6. Based on the evidence, a jury could not reasonably find that Liberty Mutual would necessarily have discovered the information contained in the 2007 loss run in the searches that were conducted during the settlement negotiations.

Liberty Mutual also argues that the information contained in the 2007 loss run was cumulative of information which Scotts already had. In a letter dated October 5, 1998, Ms. Archangeli sent materials from Scotts' records to Ms. O'Brien at Liberty Mutual which included lists of claims labeled as public liability and open claims dating from 1958 through 1966. See LM Tab E. These lists included P claim numbers but not the policy numbers. However, a comparison of the liability claim numbers found in LM Tab E with the P claim numbers in the 2007 loss run for policy number 1-181-906485-022, LM Tab R, reveals that eleven of the thirty-four claim numbers

appearing on the loss run also appear on the Scotts' lists.[5]    The
claim numbers which occur on both the loss run and Scotts' lists
relate to policies in effect as of 1962 and 1963, and accidents
which occurred from 1963 to 1965.   Scotts already knew of the
existence of a third of the liability claims contained in the 2007
loss run based on the lists of liability claims from its own
records.   Scotts' lists also reflected liability claims from 1958
through 1966, spanning a broader period of time than the dates of
the claims contained in the loss run.   Thus, Scotts already had
information indicating that liability claims were made during the
same time period, suggesting the possibility that liability coverage
may have been in place during that period.   In addition, even if the
loss   run   could   have   been   produced   during   the   settlement
negotiations, it would not have disclosed the terms and conditions
of the policy, which has never been found.

The evidence regarding the 2007 loss run is insufficient to
create a genuine issue of fact in regard to Scotts' fraud claim.

5. Other Documents

Scotts also claims that Liberty Mutual failed to disclose other
documents in its possession at the time of the settlement.    The
first is a document containing copies of computer screens of a
search of the Ensemble database.   Doc. No. 200, Barnhart Decl. Ex.
A-39.   The first screen shows an entry with the policy number LE1-
181-010660-97-22/5, and "OM Scott Company" as the insured name, with
an effective date from 10/01/67 to 10/01/68.   The next screen shows
the same policy number with the same effective dates, and in a box

---

[5]These include claim numbers P163-012346, P220-013280, P413-000979, P442-
022732, P442-024620, P443-016598, P465-020422, P478-005200, P813-003018, P877-
014737, and P822-021321.

labeled "First Year" is the date "1962." The third page shows an entry date of 10/01/1999, and the comment "This policy was put into EMS per Brian Merchant."

Scotts argues that the reference to 1962 being the first year of the policy indicates that Liberty Mutual had to have obtained that date from a liability policy or other information which was never disclosed to Scotts. However, in the briefs, Scotts does not point to any testimony authenticating these screens, or to any testimony by Mr. Merchant or any other witness explaining their meaning. It appears from the entries that the purpose was simply to enter the policy number into the computer database. It is not even clear from the documents that Mr. Merchant personally completed these entries. It would also be pure speculation for a jury to conclude that the date "1962" had to have come from evidence in Liberty Mutual's possession. The screens do not include any policy number which would have been issued in 1962. There are also other sources for the date "1962" since that date was included within the time period for which Scotts was arguing for coverage during the negotiations. For example, Scotts provided Liberty Mutual with a list of open public liability claims dating back to 1959 and open automobile claims beginning in 1962. LM Tab E. These screens could not reasonably be viewed by a jury as constituting evidence of fraudulent concealment.

Scotts also notes a Liberty Mutual computer spreadsheet indicating the years of Scotts coverage as spanning from 1958 to 1968. Doc. No. 200, Barnhart Decl. Ex. A-29. Liberty Mutual responds that this chart summarized information derived from Scotts' PowerPoint presentation materials. See Doc. No. 167, Francisco Decl. Ex. B. Scotts argues that this explanation is not credible,

66

but points to no evidence or testimony indicating that these coverage dates came from another source of information which was not disclosed to Scotts.  An examination of the two exhibits reveals that the dates on Liberty Mutual's chart correspond to the dates contained in Scotts' chart entitled "Allocation to CGL Insurers." There is another chart included in Ex. A-29 which reflects the data concerning landfills and other pollution sites contained in the PowerPoint presentation.  Thus, the exhibits themselves support Liberty Mutual's position that the coverage chart was not derived from sources other than the PowerPoint presentation.  A jury could not reasonably conclude from this evidence that Liberty Mutual concealed policy information from Scotts.

Scotts further contends that Liberty Mutual should have disclosed its manual of underwriting standards in effect from 1965 to 1969.  <u>See</u> Scotts Ex. 39.  This manual indicated that an umbrella excess policy would only be offered to existing policyholders which had underlying comprehensive general liability insurance through Liberty Mutual.  However, there is evidence that this was not an ironclad rule.  Jerry McCullough, a former forty-year employee of Liberty Mutual, testified in his deposition that while a majority of umbrella policies sold in the late 1960's had an underlying comprehensive general liability policy, that rule was subject to waiver in individual circumstances.  Scotts Ex. 88, McCullough Dep. pp. 82-83.

In addition, the evidence does not reveal how this manual would have assisted Scotts in identifying additional liability coverage. There are only three possible umbrella liability policies disclosed by the exhibits in the record.  The first is policy number LE1-181-010660-097, the policy jacket obtained by Scotts from Wausau.

67

Scotts Ex. 2.  That policy contains a reference in Item 6 to an underlying comprehensive general liability policy numbered LP1-181-01-660-077.  Id.  The second reference is found in the Liberty Mutual Insurance Schedule attached to the May 17, 1967, letter of Mr. Marsh to Art Decker, which lists an umbrella excess policy LE1-181-1-010660-096 and a comprehensive general liability policy numbered LP1-181-010660-075.  LM Tab D.  The third number is policy number LE1-181-010660-095, referred to in the premium invoice dated January 13, 1967, which was supplied to Liberty Mutual by Ms. Archangeli with her letter of March 23, 2000.  LM Tab 12.  That letter was also accompanied by an invoice dated January 13, 1967, for general liability policy number LP1-181-010660-75, the same policy listed by Mr. Marsh.  Thus, any underlying general liability policies attached to the umbrella policies are disclosed by information which Scotts or DRM possessed prior to the settlement.

The record also includes lists of public liability claims dating back to 1958 which were provided by Scotts to Liberty Mutual. See LM Tab E.  Those lists do not refer to umbrella coverage, and in any event, the 1965 standards manual would not apply to any claims against policies in effect prior to 1965.  In addition, while umbrella coverage required an underlying comprehensive general liability policy from 1965 to 1969, the standards manual does not indicate that the reverse was true, that is, that comprehensive general liability policies also required an umbrella policy. Therefore, there is no evidence that this manual would have been of assistance to Scotts in determining whether umbrella coverage existed prior to 1965.

6. Failure to Disclose Evidence of All Policies

Scotts argues that it was seeking disclosure of any types of

68

policies which were issued to Scotts by Liberty Mutual, as well as secondary evidence of those policies, under the theory that other policies would indicate the period of years during which Liberty Mutual insured Scotts, and might contain references to liability policies that were issued at the same time.

In her letter of August 14, 1998, to Liberty Mutual, Ms. Armstrong stated that Scotts was "trying to locate historical General Liability, Excess and Property insurance policies" that were issued to Scotts. LM Tab P. Although automobile accident reports and claims from Scotts' files were included with the letter, the letter makes no specific request for information regarding automobile policies. In her letter of October 5, 1998, to Ms. O'Brien, Ms. Archangeli asked Liberty Mutual to "provide us with copies of and/or any evidence of policies that Liberty Mutual may have issued" to Scotts. LM Tab E. However, the policies specifically referred to in the preceding paragraph of the letter were the umbrella excess policy documents obtained from Wausau and the CGL and public liability policies listed in those documents. No specific mention of automobile policies was made in the letter. In her letter of December 28, 1999, to Ms. O'Brien, Ms. Armstrong asked Liberty Mutual to search all records and furnish certified copies of "all policies as well as certified copies of any other potentially responsive property, general liability, umbrella, excess, auto, business and package policies," secondary evidence, and reinsurance information related to any incomplete or missing policies. LM Tab 8.

Although the above correspondence indicates that Scotts requested copies of all policies, the evidence also indicates that Scotts was only interested in proving the existence of liability

policies, and that other types of policies would only be relevant to the extent that they furnished information or clues as to the existence of liability coverage. DRM's proposed consultancy agreement with Scotts states, "It is our understanding that The Scotts Company ... is considering whether to make claims against certain insurers which provided comprehensive general liability insurance to the Company, subsidiaries or predecessors at various times" to seek reimbursement for environmental remediation required at past and present manufacturing sites. Scotts Ex. 63. Ms. Archangeli testified in her deposition that comprehensive general liability and umbrella excess "are the kinds of coverage we were interested in, you know, not auto or workers' comp." LM Tab M, Archangeli Dep. p. 190.

There is no evidence that Liberty Mutual was ever able to find any actual policies of any kind for the time period between 1957 and 1968. Prior to 1978, Liberty Mutual's written document retention procedures provided that policies would be held for no more than six or seven years following expiration. Doc. No. 167, Francisco Decl. Exs. O, P. Under these procedures, any policy issued to Scotts would have been destroyed by 1975.

Some secondary evidence of other types of insurance coverage issued to Scotts was located during the Phase II search, including information relating to reinsurance, worker's compensation and director's and officer's liability coverage. With the exception of the 1967 letter from William Marsh to Art Decker, which included a list of Liberty Mutual policies in existence at that time, there is no evidence that any of these other documents contained any reference to general or umbrella liability policies. The Marsh letter was disclosed to Scotts. Further, as discussed above, Scotts

had secondary evidence from its own files, including lists of open
public liability claims dating back to 1958, and automobile claims
dating back to 1959.  See LM Tab E.  Any secondary evidence in
Liberty Mutual's possession was cumulative of the information Scotts
already had in regard to the span of years over which Liberty Mutual
may have issued policies of any kind to Scotts.

7. Failure to Provide Documents Directly to Scotts

Scotts also alleges that although Ms. Yahia submitted documents
to Ms. Archangeli of DRM with her letter of August 27, 1999, those
documents were never submitted to Scotts, and that this constituted
a concealment of material information.  However, the evidence is
insufficient for a jury to reasonably find that Liberty Mutual
thereby intended to conceal material facts from Scotts.

There is conflicting evidence as to whether Liberty Mutual was
instructed to send information to Scotts or DRM.  Mr. Merchant
understood that Ms. Armstrong had requested that any future
correspondence be directed to her attention, with a copy to Ms.
Archangeli.  Scotts Ex. 64, January 28, 1999, letter from Mr.
Merchant to Ms. Armstrong.  However, in her letter of October 5,
1998, drafted on DRM stationary, Ms. Archangeli asked Ms. O'Brien
to review Liberty Mutual's records and "provide us with copies of
and/or any evidence of policies" that may have been issued to
Scotts, which could reasonably be read as requesting that
information be sent to DRM.  Ms. Armstrong stated in a letter to Ms.
O'Brien dated December 28, 1999, that by the time a meeting with
Liberty Mutual was scheduled, she hoped that Liberty Mutual would
"have provided us (DRM, Inc.) with any additional policy information
that you locate."  LM Tab 8.  The reference to "DRM, Inc." in
parentheses might also reasonably be read as requesting that the

71

information be sent to DRM.

In addition, Ms. Yahia testified that she was instructed by Scotts to send all information to Ms. Archangeli. LM Tab 15, Yahia Dep. p. 169. Ms. Yahia also stated that prior to the November 1999 letter of Ms. Archangeli, she was under the erroneous impression that Ms. Archangeli was acting as coverage counsel for Scotts, and therefore, at the time of her August 27th letter, Ms. Yahia didn't think that she would send anything directly to Scotts. Id. at 170.

The evidence also indicates that DRM was Scotts' consultant. Scotts Ex. 80, Armstrong Dep. p. 666. The DRM contract proposal to Scotts states that DRM would act as Scotts' advisor and perform duties such as identifying and recovering lost policies, preparing and delivering information necessary to accomplish a meaningful analysis of the environmental insurance claims, and providing communication with insurers to facilitate the negotiations for settlement of the claims. See Scotts Ex. 63. Thus, it was part of DRM's contractual role to obtain information from Liberty Mutual and analyze that information. A jury could not reasonably find that Ms. Yahia's failure to send the documents included in the August 27, 1999, letter to Ms. Armstrong as well as to Ms. Archangeli, who was acting on Scotts' behalf during the negotiations, indicated an intent on the part of Liberty Mutual to conceal information from Scotts.

There is also evidence that Ms. Armstrong was aware of the documents. Ms. Armstrong testified that either she participated in the phone call between Ms. Archangeli and Ms. Yahia during which Ms. Yahia stated she was sending documents to Ms. Archangeli, or that Ms. Archangeli told her about the call. LM Tab G, Armstrong Dep., p. 854. The record also includes Ms. Armstrong's notes dated August

15, 1999, which contain the statement "Liberty - Attny sending policy info." LM Tab H.  In addition, Ms. Archangeli testified that she either sent Ms. Armstrong a copy of the 1999 loss run or summarized it for her.  LM Tab I, Archangeli Dep. pp. 418-419. Thus, the evidence shows that Ms. Armstrong was, at the very least, aware of the existence of the documents and the fact that Ms. Yahia was sending documents to Ms. Archangeli.  The failure of Liberty Mutual to send the documents directly to Ms. Armstrong is insufficient to constitute a fraudulent act of concealment of material information on the part of Liberty Mutual.

F. Company-Wide Search of Records

6. In a June 11, 1999, letter, Mr. Merchant stated: "As recently as our March 5, 1999, meeting, both you and Scotts provided additional information regarding its list of potential named insureds, thus expanding our search criteria.  This information was confirmed by your letter dated March 19, 1999.  Upon receipt of this information, Liberty Mutual continued its diligent, company-wide search of its records to find any information relating to Scotts policies." June 11, 1999, Merchant letter, Ex. A-23 [Scotts Ex. 6].

7. In a June 28, 1999, letter, Mr. Merchant repeated his earlier representation that "Liberty Mutual continued its diligent, company-wide search of its records to find any information relating to Scotts policies." June 28, 1999, Merchant letter, Ex. A-24 [Scotts Ex. 7].

9. In her August 27, 1999, letter to DRM, Ms. Yahia stated that Liberty Mutual conducted an "internal search for any and all documents relating to OM Scotts and other entities for which OM Scotts indicated it may be seeking coverage." Aug. 27, 1999, Yahia letter, Francisco Decl. Ex. U [LM Tab 7].

14. In her October 28, 1999, letter to Ms. Archangeli, Ms. Yahia stated that Liberty Mutual "performed a company-wide search for lost policy information." Oct. 28, 1999, Yahia letter, Ex. A-25 [Scotts Ex. 57].

32. During the 1998-2000 negotiations, Liberty Mutual indicated both in writing and in their discussions that they were conducting a company-wide search for either policies or secondary evidence of policies. Archangeli Dep. p. 472 [Scotts Ex. 10]; Armstrong Aff., Ex. A-8 [Scotts Ex. 24] and Ex. A-26 [Scotts Ex. 23].

The above allegations of fraud relate to statements that Liberty Mutual had conducted a "company-wide search" for policies and secondary evidence. Liberty Mutual points to evidence indicating that the statement is true. As stated above, the record includes three requests to Liberty Mutual librarians requesting all liability policies for all years for Scotts and related entities. LM Tabs 2-4. Ms. Chartrand testified that this phase of the search entailed sending a policy request form to the Dover librarian, where the Liberty Mutual policies are housed. LM Tab 19, Chartrand Dep. p. 25. The librarian would notify them of any policies which were found there, as well as provide a list of what was in the Stoughton or Iron Mountain storage facilities. Id. She stated that the standard procedure was to "look through the entire box" even if it was indicated that there may be just a couple of policies. Id.

Scotts has submitted the declaration of its expert, Ronald Hendy, stating that automobile and workers compensation policies are typically the subject of frequent claims that generate a paper trial for secondary evidence, and that Liberty Mutual should have also looked for such policies. Scotts Ex. 4, Hendy Decl. ¶ 264. However, Ms. Chartrand testified that when no general liability policies were found, they would look at other types of coverage such as workers' compensation and automobile coverage to see if they contained references to general liability policies; however, this type of search was only successful in one percent of the cases. Scotts Ex. 84, Chartrand Dep. pp. 31-33.

The record includes a Phase II request sent by Ms. Chartrand. LM Tab 5.  Mr. Schlemmer described the Phase II search as one in which "you try to make every search that you can find or identify.... [T]he idea is to try to uncover every stone and see what you can find." Scotts Ex. 95, Schlemmer Dep. pp. 192-193.  Ms. Chartrand testified that this phase of the search was commenced if no policies were found.   LM Tab 19, Chartrand Dep. p. 27.  A search request was sent to all divisions that might be applicable, and therefore, if a policy was written out of a particular division, they would target that division as well as the Home Office Department. Id. at pp. 25-26.  If a positive response was received, then that material would be requested, and all of those boxed would be reviewed.   Id. at p. 26.   A report would then be generated describing what was found, and indicating the items which were not sent to the attorneys because they did not appear to be relevant. Id. at p. 26.

Ms. Chartrand sent a Phase II search request to twenty-eight Liberty Mutual offices which were likely sources of information. These included: the Distribution Services, Commercial Markets Underwriting Support and Commercial Markets Production Departments at Lewiston; the National Risks Underwriting, National Markets Product Management and Development, Business Lines Underwriting, National Risk Sales, Business Sales, Customer Services, Internal Auditing, Reinsurance, Credit, Loss Prevention, and Financial-Salary and Sales Compensation Departments at the Home Office; the Special Claims Examining and Customer Accounting Services for the Home Office at Dover; the Loss Prevention and Research Center and Engineering Solutions Departments at Hopkinton.  The search was also directed to several offices handling the business of the Central

Division where Scotts is located, including: Central Division National Sales, Business Sales, Business Accounts Underwriting, Regional Business Accounts Underwriting, Financial, Financial Field Auditing, Credit, Claims, Loss Prevention, and Central Home Office/Dover Customer Accounting Services. LM Tab 5. Multiple Scotts entities were listed as named insureds.

Under the heading "INSURED INFORMATION," the form lists Scotts' account number (010660), comprehensive general liability and umbrella excess liability as lines of coverage, and 1967-1968 as the years of coverage. However, Ms. Chartrand testified that this information did not limit the scope of the search; rather, it simply indicated the information that the party requesting the search already had and served as a reference for the person reviewing any information which was received. LM Tab 19, Chartrand Dep. pp. 89-90. She stated that the recipients of the Phase II request were instructed on the form that she wanted any and all information, and if recipients of the search request called with questions, they were instructed to send everything. Id. at p. 90. The form request stated:

> Specifically, you are responsible for providing ANY AND ALL documents including but not limited to correspondence, underwriting files, master files, rating data, prospect files, bills and audits, coverage files, losses, state filings, retro plans/endorsements, retro adjustments, sales files, renewal files, certificates of insurance, credit files, premium information, ledger cards, audit files, policies, coverage bulletins, alpha cards, register cards, wheel deck cards, claim servicing instructions, and inspection reports.
>
> In addition, your search should not be limited to hard copy documents but should also include data maintained electronically on databases, indexes, spreadsheets, electronic mail, or micro fiche.

LM Tab 5.

Ms. Chartrand also sent a PRISM Request Form dated April 27, 1999, asking for a loss run from the I/S database. LM Tab AA. The form included the O.M. Scott and Sons Company and other Scotts entities. Under "LINE OF BUSINESS REQUESTED" is the entry "GL." However, the language on the form also states, "Please include any and all policies for the search. Please include all effective dates. Please include in the query Market, division, territory, and serial number equals LE1-181-010660-097 and LP1-181-010660-077." The LE1 policy number corresponded to the umbrella excess liability policy jacket provided by Scotts.

Liberty Mutual also commenced a second Phase II search for evidence prior to the settlement. The record includes a memorandum from Mr. Kostecki to Mr. Merchant dated June 5, 2000, indicating that Ms. Armstrong had requested another policy search, and that Mr. Kostecki had agreed with this request. Mr. Kostecki asked Mr. Merchant to do another search for Scotts policies. LM Tab 28. A Phase II request dated June 21, 2000, was sent by Ms. Chartrand. LM Tab 6. Liberty Mutual states in its memorandum of May 19, 2008, that despite the fact that the settlement was executed on July 12, 2000, "[i]t is undisputed that Liberty Mutual completed the second Phase II search anyway, but did not find any additional relevant documents." Doc. No. 231, p. 11.

Scotts contends that the Phase II search in this case was limited to a search for liability policies from 1967 to 1968. See Scotts Ex. 12, Hendy Decl., p. 80. However, Mr. Hendy's opinion is based on the fact that the request form listed those years under insured information. Ms. Chartrand testified that the indication of those dates under insured information on the request form did not

limit the scope of the search to just those years, or to general liability policies; rather the form requested production of "ANY AND ALL documents." LM Tab 19, Chartrand Dep. pp. 89-90; LM Tab 5. This testimony is supported by the fact that the Phase II search request did produce information outside the category of general liability and the dates 1967-1968, including: 1) the file on officers' and directors' liability policies sold to Scotts by Art Decker, see Francisco Decl., Ex. U; 2) a business sales masterfile regarding payments to sales representatives for policies in 1969; 3) workers compensation underwriting reports for Grace Sierra Horticultural Products (one of the Scotts entities listed in the search request) for 1988 to 1994; and 4) and a folder relating to reinsurance. Scotts Exs. 77 and 78.

Ms. Chartrand also testified that the fact that the attorney might be interested in just general liability policies did not limit the scope of the search. She stated that after reviewing all of the produced documents, a facts report was created, and items which did not appear to fall within the category of information being sought by the attorney would still appear on a list of items which were not being sent. Id. p. 26. Thus, the attorney was notified of the availability of apparently nonconforming materials and could request to see them. Ms. Chartrand further testified that the type of general policy information requested in Ms. Armstrong's tender letter of December 28, 1998, LM Tab 8, would have been within the norm of the types of documents which would be gathered in a Phase II search. LM Tab 19, Chartrand Dep. pp. 91-92.

Scotts has submitted the declaration of Ronald Hendy in which he offers the opinion that the search team was uninformed about the type of records which should be sought, noting in particular that

Ms. Yahia did not call the head of underwriting to inquire about Scotts documents, and that she was unaware of what public liability closing notices were.   Scotts Ex. 12, Hendy Decl., ¶¶ 268-270. Scotts also relies on the declaration of Paul Amoruso, a former Liberty Mutual employee, who stated that based on Liberty Mutual's record retention policy, Liberty Mutual should have had many documents which would have been potential sources of secondary evidence, such as closing notices, claimant data, endorsement information and commission information.   Scotts Ex. 11, Amoruso Dec., p. 7.   Mr. Amoruso reviewed the depositions of Mr. Brigada, Ms. Olsen and Ms. Yahia, and offered the opinion that these Liberty Mutual representatives did not perform a reasonable, good faith search of available records.   Id. p. 10.   He claimed that no financial records, premium or loss records, sales commission records, loss prevention reports, reporting records, checks issues or loss runs were reviewed.   Id.

Although Mr. Amoruso and Mr. Hendy repeatedly state that these individuals did not search for documents, there is no evidence that any of these employees were personally responsible for going to Liberty Mutual's many offices and storage facilities to search for documents.   For example, Ms. Yahia testified that her role was to look at all of the information which was collected and advise Liberty Mutual on the likelihood of Scotts meeting its burden of proof on the policies.   Scotts Ex. 96, Yahia Dep. p 108.   A broad Phase II search request was sent to twenty-eight different departments and offices within Liberty Mutual which were likely to have any information concerning Scotts' accounts and policies.   The fact that Mr. Brigada, Ms. Olsen, or Ms. Yahia did not personally review or look for these records does not mean that other Liberty

79

Mutual employees in the various departments which received the broad Phase II search request did not do so.  They were instructed by the search team to produce "ANY AND ALL DOCUMENTS."  LM Tab 5.

Similarly, even assuming that the persons in the legal department such as Ms. Yahia were not familiar with certain types of records, this does not prove that the employees in each office or division, who were presumably more familiar with the records in their respective offices, failed to conduct a diligent search for all relevant documents.  Considering the magnitude of the search involved, Ms. Yahia and the persons in the litigation support unit necessarily had to rely on the employees in other offices and their expertise and familiarity with their own records to perform the actual searches for documents.  The Phase II search request generated only four affirmative responses, and Ms. Yahia asked to see all relevant documents which had been found.  See LM Tabs 77 and 78.

It was the responsibility of the paralegals in the litigation support unit such as Ms. Chartrand to initiate the Phase II search by asking relevant departments and offices to search for documents, and to review the materials which were collected from those departments.  LM Tab. 19, Chartrand Dep. p. 24.  The Phase II search request she circulated to twenty-eight different Liberty Mutual offices requested "ANY AND ALL DOCUMENTS."  LM Tab 5.  The documents requested included financial information such as bills and audits, credit files, audit files and premium information, sales files and information concerning losses.  Id.  The search request was also sent to twenty-eight offices, including departments concerned with underwriting, sales, customer services, auditing, credit, loss prevention, and sales compensation, claims and claims examining,

business accounts and customer accounting services.  Id.

Scotts' experts make much of the fact that Ms. Yahia and her assistants did not review records on microfilm or microfiche.  The evidence indicates that it is questionable whether such records were available.  Ms. Yahia testified in her deposition that she did not look for microfilm because she had been told on more than one occasion that Liberty Mutual did not have microfilm or microfiche. Scotts Ex. 96, Yahia Dep. pp. 381-382.  Mr. Brigada testified that as a claims examiner, he used to review microfilm or microfiche which was used at one point to store copies of checks and very limited claim payment information at the Home Office, but that since there was no longer a claim examiner function he did not know what happened to those records, which would have become obsolete in light of new technology.  Scotts Ex. 29, Brigada Dep. pp. 57-59. Elizabeth Flanders testified that certain lines of policies might be maintained on microfiche.  She mentioned workers compensation as a possibility, but did not know about any other lines such as general liability.  Scotts Ex. 86, pp. 67-69.  In any event, the request form for the Phase II search specifically referred to any data maintained on microfiche as being within the scope of the search request.  LM Tab 5.

Insofar as Scotts' experts have indicated that the search team should have reviewed claim files, Ms. Olson testified in her deposition that she has looked for claim files that went back to the 1960s, but that she had never located any, and that the claims reflected on the 1999 loss run would have been destroyed under Liberty Mutual's document retention policy.  Scotts Ex. 99, Olson Dep. pp. 111-112.

Documents such as the 2006 and 2007 loss runs, the 1969

81

business earnings report, the 1965 underwriting manual and specimen policies which Scotts contends should have been discovered in Liberty Mutual's records and disclosed to Scotts have been discussed above in the section on disclosure of documents.

Liberty Mutual also argues that the statements regarding a "company-wide search" were not material because Scotts indicated a willingness to arrive at a settlement before Liberty Mutual had completed all searches. In a letter to Mr. Merchant dated February 18, 1999, Ms. Archangeli advised Mr. Merchant of Scotts' desire to give a PowerPoint presentation which would include an "[o]ffer to settle the case based upon the information gathered to date and certain assumptions about coverage limits and standard terms and conditions." LM Tab 26. In a letter dated May 18, 1999, to Mr. Merchant, Ms. Archangeli stated,

> Scotts is content to negotiate a settlement based upon the policy information that is available at this point in time. It seems unlikely to us that after nine months of looking for these policies, Liberty Mutual will turn up any new policy information. Therefore, rather than delay negotiations while you continue to look for policies, we propose again that we try to negotiate a resolution to Scotts' environmental claims based on the facts as we know them today.

LM Tab 27. In June of 2000, Ms. Armstrong spoke aggressively with Mr. Kostecki and asked him to continue to look for additional evidence. LM Tab 10, Armstrong Dep. pp. 948-49. On June 5, 2000, Mr. Kostecki sent an e-mail to Mr. Merchant informing him that Ms. Armstrong had requested another policy. Mr. Kostecki agreed with that request and asked Mr. Merchant to initiate another search for Scotts policies. LM Tab 28. Another Phase II request was sent to Liberty Mutual offices on June 21, 2000. LM Tab 6. However, on June 9, 2000, Ms. Archangeli "vehemently" told Mr. Merchant that

Scotts wished to continue the settlement negotiations while the second Phase II request was being completed. LM Tab 29. The settlement was executed on July 12, 2000. Thus, even though Liberty Mutual was willing to continue searching its records, and in fact did so, Scotts decided to execute the settlement before the second Phase II search was completed.

Based on the evidence, a jury could not reasonably find that the representations concerning a "company-wide search" were intentionally or recklessly false, and the evidence presented on that claim fails to raise a genuine issue of fact.

G. Correspondence Relating to Art Decker

The next allegations relate to a letter dated October 28, 1999, from Ms. Yahia to Ms. Archangeli, regarding information obtained by Ms. Archangeli from Mr. Decker, the former Liberty Mutual agent who was the recipient of the May 17, 1967, letter sent by William Marsh, Scotts' insurance manager. See LM Tab 7.

> 12. On October 28, 1999, Ms. Yahia sent Ms. Archangeli a letter in which she disputed Mr. Decker's recollection that he had sold general liability policies to Scotts. Oct. 28, 1999, Yahia letter, Ex. A-25 [Scotts Ex. 57].

There is only one statement in Ms. Yahia's letter regarding Mr. Decker's recollection. Ms. Yahia stated that Mr. Decker, in response to Ms. Archangeli's question as to whether "he recalled anything about Liberty Mutual's selling general liability policies to Scotts," said "that he did not." Scotts Ex. 57. There is no evidence that this statement was false. In fact, Ms. Archangeli responded in her letter of November 2, 1999, to Ms. Yahia that Mr. Decker "could not remember accurately [what] kind of insurance it was that Liberty issued to O.M. Scott." LM Tab 31. Mr. Decker also testified in his deposition that he did not recall the type of

83

insurance that was purchased by O.M. Scott through him.  LM Tab 32, Decker Dep. p. 16.[6]  In addition, there is no evidence that Scotts or DRM would have relied on the statement in Ms. Yahia's letter because Ms. Archangeli spoke with Mr. Decker personally, and could determine the extent of his recollection for herself.

> 13. In her October 28, 1999, letter to Ms. Archangeli, Ms. Yahia represented that it was "unethical" for DRM to contact former Liberty Mutual employees.  Oct. 28, 1999, Yahia letter, Ex. A-25 [Scotts Ex. 57].

The statement that it was "unethical" for Ms. Archangeli to contact Mr. Decker directly is not a statement of fact related to the subject matter of the settlement negotiations, but rather a statement of opinion concerning the legality of the manner in which Ms. Archangeli was investigating those matters.  Even if paragraph 13 is broadly construed as an allegation that Ms. Yahia attempted to conceal material information by discouraging Ms. Archangeli from talking with former Liberty Mutual employees, the evidence in the record on this point is insufficient to create a genuine issue concerning any intent to defraud.

The evidence reveals that at the time she drafted her letter of October 28th, Ms. Yahia was under the impression that DRM was acting as coverage counsel for Scotts.  LM Tab 15, Yahia Dep. p. 170.  That impression was not unreasonable in light of the fact that Ms. Archangeli's business card indicates that she is an attorney.  LM Tab 33.  Ms. Archangeli first informed Ms. Yahia in her letter of November 2, 1999, that DRM was acting as a consulting firm, not as coverage counsel.  LM Tab 31.  Scotts has submitted a legal

---

[6]In fact, the only evidence in the record of the type of insurance sold by Mr. Decker to Scotts relates to directors' and officers' liability policies.  See Doc. No. 167, Ex. U.

opinion letter authored by Attorney Geoffrey Stern indicating that Ms. Archangeli's act of contacting Mr. Decker, a former employee of Liberty Mutual, was not unethical. Scotts Ex. 58. However, Ms. Yahia obviously did not have the benefit of that opinion letter prior to her letter of October 28, 1999. Assuming arguendo that Ms. Archangeli's conduct would not have been unethical even if she had been acting as coverage counsel, there is no evidence to indicate that Ms. Yahia deliberately misrepresented the ethics rules in effect in Massachusetts where she practices as opposed to being mistaken about the finer points of those rules. There is no evidence that Ms. Yahia ever pursued the matter further. Since Ms. Archangeli had already spoken with Mr. Decker, Ms. Yahia's letter did not preclude her from obtaining information from Mr. Decker. There is also no evidence that Ms. Archangeli relied on Ms. Yahia's statement, since, as an attorney, Ms. Archangeli is presumably capable of doing her own research on the scope of the ethical rules applicable to her conduct.

There is also no evidence from which a jury could reasonably conclude that Liberty Mutual otherwise discouraged Scotts or other insureds from contacting former employees for the improper purpose of concealing material information. Rather, Liberty Mutual generally requested that insureds not contact former employees because of the sheer number of policy holders who would be contacting former retired employees. Scotts Ex. 94, Schlemmer Dep. p. 196. Mr. Schlemmer testified, "It has something to do with treating our former employees with dignity and respect and not having their phones ringing at different times of the day and people asking them questions.... You wouldn't want a bunch of your former clients calling you when you're trying to enjoy your retirement."

Id. at pp. 196-197.  Mr. Schlemmer further testified that they were willing to ask Mr. Decker questions.  Id. at 197.  He also testified that he didn't recall specifically whether he gave instructions to anyone to tell Scotts or DRM that they should not talk to former Liberty Mutual employees, but that he didn't think he "would ever say you're not allowed.  I think I would generally make the request that you let us know and that we would work out the arrangements."  Id. at 198.

Ms. Archangeli gave some names of former employees to Liberty Mutual as persons to contact, but she did not remember if Liberty Mutual followed up on these leads.  Scotts Ex. 83, Archangeli Dep. p. 470-471.  The record indicates that in a conversation with Mr. Merchant on June 9, 2000, Ms. Archangeli requested the names of former Liberty Mutual employees and any information obtained from interviews of those employees by Ms. Yahia or Mr. Prouty, and Mr. Merchant forwarded her request to Mr. Kostecki.  LM Tab 29.  However, on June 13, 2000, Ms. Armstrong sent an e-mail to Rebecca Pager-Bruening recommending that Liberty Mutual's latest settlement offer be accepted, see LM Tab 43, and on July 12, 2000, the settlement was executed, thereby making any further inquiries to former Liberty Mutual employees unnecessary.  There is no evidence that any former Liberty Mutual employee identified by Ms. Archangeli, other than Art Decker, furnished information concerning Scotts' policies to anyone at Liberty Mutual or that any former employee could have provided information material to the Scotts matter.

Ms. Yahia's letter of October 28, 1999, and the evidence on these points is insufficient to establish fraud on the part of Liberty Mutual or to raise a genuine issue of fact in that regard.

## H. Verification of Umbrella Policy

Scotts further argues that Liberty Mutual representatives committed fraud by refusing to acknowledge that the umbrella policy allegedly issued by Liberty Mutual was accurate and complete:

> 17. Mr. Merchant's December 6, 1999, letter stated that Liberty Mutual was "unable to verify" that the Umbrella Policy was complete or accurate.  Dec. 6, 1999, Merchant letter, Ex. A-21 {Scotts Ex. 9].

> 31. During the 1998-2000 negotiations, Liberty Mutual told DRM "that we didn't have proof of the [excess] policy, because they said it was only a partial policy. Archangeli Dep. pp. 244-245 and 483 [Scotts Ex. 83] (testifying that Liberty Mutual disputed that the umbrella excess policy was a complete or accurate policy by calling it alleged throughout the negotiations).

These allegations relate in part to the umbrella excess liability policy jacket which Scotts obtained from Wausau, which refers to policy number LE1-181-010660-097, in effect from 10-1-67 to 10-1-68.  Mr. Merchant noted in his letter of December 6, 1999, to Ms. Archangeli that Scotts had provided Liberty Mutual with a copy of an alleged umbrella excess liability policy consisting of an umbrella excess declarations page, two endorsements, and an umbrella excess liability policy jacket.  Scotts Ex. 9.  Mr. Merchant further stated, "At this juncture, Liberty Mutual has been unable to verify that these documents represent a complete and accurate copy of all terms and conditions of any policy that may have been issued to O.M. Scotts by Liberty Mutual."  Id.

The above statements are in the nature of an expression of Liberty Mutual's position or opinion regarding the completeness of the policies, not statements of fact.  Whether or not the policy was complete was a legal question.  In addition, Mr. Merchant testified

in his deposition that although he thought there was sufficient information to indicate that there were two excess liability policies and possibly a primary liability policy, "we did not have the terms or conditions. They were incomplete policies." Scotts Ex. 89, Merchant Dep. p. 180. He further testified that the umbrella excess policy was a part of a policy, but that it was missing the terms, and conditions as well as the underwriting or instruction page, which would list the pages and all the endorsements and exclusions, as well as what jacket would apply to that particular policy. Id. at 222. Both Scotts and Liberty Mutual were unable to find a complete copy of the policy documents. Scotts Ex. 94, Schlemmer Dep. p. 69.

Ms. Yahia testified in regard to the umbrella excess policy that Scotts provided them with some pages from an excess policy for the time frame in question, but that "without a policy, it's hard to say to whom the policy was issued or what any of the terms or conditions were." Scotts Ex. 96, Yahia Dep. pp. 96–97. She stated that "this excess form is certainly evidence that there may have been this type of excess coverage, but this is a very thin form, which does not necessarily represent a full policy." Id. at p. 97.

Liberty Mutual further argues that the testimony of Scotts' expert, Ronald Hendy, also supports a finding that the policy was not complete. In a letter to Mr. Merchant dated April 20, 2000, Ms. Archangeli maintained that the policies issued by Liberty Mutual to Scotts did not contain the owned property exclusion. LM Tab 34. However, Mr. Hendy testified that the umbrella excess liability jacket had an exclusion relating to both owned property and care, custody and control, and that the policy had no endorsement deleting that exclusion. LM Tab 35. Therefore, if Ms. Archangeli's position

regarding the policy is correct, the policy is not complete because it lacks the endorsement deleting the exclusions.

There is no evidence that Liberty Mutual had any other documents or policy information which would have disclosed the complete policy.  In light of this evidence, a jury could not reasonably find that Liberty Mutual's statements that the umbrella excess policy was a partial policy was deliberately false or made with the intent to deceive.  Rather, it was a position which Liberty Mutual representatives held during the negotiations, an opinion which was based on the undisputed fact that pages were missing from the policy documents.  In addition, there is no evidence from which a jury could conclude that Scotts reasonably relied on these statements.  Scotts continued to pursue the settlement negotiations. Scotts had its own experts who were capable of evaluating the sufficiency of the documents and weighing Scotts' chances of proving the existence of the policy based on those documents.

Liberty Mutual further contends that these statements were not material because Liberty Mutual eventually conceded the existence of the umbrella excess policy for 1967-1968, as well as another umbrella excess policy for 1966-1967, for purposes of settlement. Ms. Yahia testified in her deposition that she told Scotts that they had a pretty good case on the policies for 1966-1968.  LM Tab 15, Yahia Dep. pp. 104-05, 121.  Ms. Archangeli's phone log of a call to Robert Kostecki on June 5, 2000, states that Liberty Mutual recognized "the 2 primary and two excess policies in the late 1960's."  LM Tab 14.  Ms. Archangeli's notes of a conversation with Mr. Merchant dated June 9, 2000, also state that "LM conceded 2 yrs." and "settlement offer based on 2 yrs. of cov."  LM Tab 16. In her letter of May 26, 2000, to Mr. Kostecki, Ms. Archangeli

stated that it was her understanding that Liberty Mutual's offer was based on "one liability and umbrella policy to Scotts from 1967-1968." LM Tab 13.

Scotts disputes that Liberty Mutual ever recognized the existence of coverage. For example, Ms. Archangeli testified in her deposition that Liberty Mutual never conceded coverage for a period of years. Scotts Ex. 19, Archangeli Dep. pp. 344-345. However, the issue of coverage under the umbrella and liability policies is distinct from the issue of whether Scotts could meet its burden of proving the existence of the policies. Ms. Yahia testified that Liberty Mutual was evaluating the available information for purposes of a settlement, not any kind of agreement on coverage. Scotts Ex. 27, Yahia Dep. p. 111. She stated that "no one wanted a determination of coverage, and it was an analysis of the likelihood of proof of the policies." Id.; see also Scotts Ex. 89, Merchant Dep. p. 255 (their conversations would have concerned the policies, not the issue of coverage). The fact that Liberty Mutual may have been unwilling to acknowledge that Scotts had coverage based on the 1967-1968 umbrella excess liability jacket is not inconsistent with Liberty Mutual's position, for purposes of settlement, that it was willing to base its settlement offer on policies covering a two-year period.

Ms. Archangeli also testified that no one at Liberty Mutual ever acknowledged that Liberty Mutual wrote the policies, and that her statement regarding Liberty Mutual conceding two years of coverage was simply her own assessment of the settlement offer. Scotts Ex. 83, Archangeli Dep. p. 346. However, the information recorded in her own notes and phone logs had to have been derived from something other than pure speculation, such as statements made

90

by Mr. Kostecki and Mr. Merchant during their phone conversations. In any event, there is no evidence that an express admission by Liberty Mutual regarding the existence of the policies was a prerequisite of the settlement.

The evidence that Liberty Mutual was unwilling to acknowledge that the umbrella excess policy submitted to them by Scotts was a complete policy is insufficient to create a genuine issue of fact on Scotts' fraud claim.

I. 12-6-9 Merchant Letter

Scotts also contends that the December 6, 1999, letter from Mr. Merchant to Ms. Archangeli contained various misrepresentations concerning the nature of the coverage under the alleged policies.

18. Mr. Merchant's December 6, 1999, letter stated: "There has been no 'suit' filed against O. M. Scotts and therefore, there is no obligation or duty to defend these claims under the alleged Liberty Mutual policies." Dec. 6, 1999, Merchant letter Ex. A-21 [Scotts Ex. 9]; Hendy Decl. ¶135 [Scotts Ex. 53] (stating that this overlooks the fact that in 1998, when Scotts provided timely notice of its insurance claims, Scotts had by then received notifications of impending legal action by the EPA).

19. Mr. Merchant's December 6, 1999, letter to DRM stated: "[C]overage may only apply under the [Umbrella Excess Liability] policy, if at all, upon exhaustion of the retained limit of an underlying policy and the UEL policy retention." Dec. 6, 1999, Merchant letter, Ex. A-21 [Scotts Ex. 9]; Hendy Decl. ¶136 [Scotts Ex. 53] (stating that this misrepresents the coverage provided under Scott's umbrella policies).

20. Mr. Merchant's December 6, 1999, letter to DRM stated: "There is no coverage under the alleged policies for property damage which was expected or intended or which was not otherwise caused by an occurrence, within the meaning of the policies." Dec. 6, 1999, Merchant letter, Ex. A-21 [Scotts Ex. 9]; Hendy Decl. ¶141 [Scotts Ex. 53] (stating that this misrepresents how the issue of fortuitous loss applies under the general liability insurance contract).

21. Mr. Merchant's December 6, 1999, letter to DRM stated: "To the extent that the alleged property damage occurred before or after Liberty Mutual's alleged period of coverage, coverage for these claims may be precluded." Dec. 6, 1999, Merchant letter, Ex. A-21 [Scotts Ex. 9]; Hendy Decl. ¶¶ 150-166 [Scotts Ex. 53] (giving opinion that this mischaracterizes how multiple accidents or occurrences and gradual losses can be ascribed to any particular policy period).

22. Mr. Merchant's December 6, 1999, letter to DRM stated: "To the extent that the alleged damages do not constitute property damage, as this term may be defined in the alleged policies, coverage will not apply." Dec. 6, 1999, Merchant letter, Ex. A-21 [Scotts Ex. 9]; Hendy Decl. ¶¶ 172 and 176 ( stating that this mischaracterizes the nature of coverage Liberty Mutual provided to Scotts).

23. Mr. Merchant's December 6, 1999, letter to DRM stated: "There is no coverage under any alleged policy or policies for costs or expenses or other obligations voluntarily assumed or incurred by O.M. Scotts without notice to and consent of Liberty Mutual." Dec. 6, 1999, Merchant letter, Ex. A-21 [Scotts Ex. 9]; Hendy Decl. ¶180 {Scotts Ex. 53] (stating that this mischaracterizes the insurance industry custom and practice).

The above statements were made in the December 11, 1999, letter from Mr. Merchant to Ms. Archangeli.  See Scotts Ex. 9.  Liberty Mutual argues that the above statements are not statements of fact, but rather articulate Liberty Mutual's opinion or position in regard to potentially applicable defenses to coverage based on the umbrella excess liability policy documents which had been tendered by Scotts. This court agrees.  The statements in the letter are preceded by language which states: "In addition, to the extent that a policy or policies are located or are confirmed complete, we take this opportunity to alert you to policy terms, conditions and exclusions that, depending upon the applicable policy language, limit and/or bar coverage for losses incurred in connection with these

claims:[.]" _Id_.  This language indicates that the statements which follow are statements of Liberty Mutual's position regarding potential defenses to coverage.  The applicability of these defenses is also made dependent on future events, specifically, whatever language might be contained in any policies which may or may not be located or deemed to be complete in the future.  They are not statements of present fact.

Scotts also alleges that the statement in the letter that "[t]here is no 'suit' filed against O.M. Scotts" is false.  However, the evidence does not reveal that a court action was filed against Scotts.  The record includes a letter dated February 10, 1997, which was sent to Scotts by the Ohio Environmental Protection Agency. This letter informs Scotts that the environmental enforcement matters relating to Scotts had been referred to the Ohio Attorney General's Office for resolution.  LM Tab 36.  Ms. Armstrong testified that she was aware that in 1997 or 1998, the Attorney General's Office had sent Scotts a proposed consent order.  Ex. 80, Armstrong Dep. p. 644.  However, there is no evidence that a legal action was filed, or that, prior to Mr. Merchant's December 6th letter, Liberty Mutual was advised of the filing of any court proceedings which were ongoing at the time.  In addition, the placement of quotation marks around the word "suit" indicates that the statement was meant, not as a factual statement, but rather to convey Liberty Mutual's opinion or position that no "suit" within the scope of that contract term, as interpreted by Liberty Mutual, had been filed against Scotts which would trigger a duty to defend.

There is also no evidence that Scotts justifiably relied on any of the above statements.  Scotts was in the best position to know whether a legal suit had been filed.  As to all of the above

statements concerning possible defenses, there is evidence, noted previously, that Scotts had its own experts who were capable of evaluating the language of the umbrella policy documents and the strength of Scotts' position and Liberty Mutual's defenses in seeking a settlement. During the negotiations, Scotts had the assistance of persons such as Ms. Archangeli and Ms. Armstrong who were familiar with insurance contracts and the customs and practices of the insurance industry. Scotts could not have justifiably relied on the representations of Liberty Mutual concerning the meaning of the language in the umbrella policy, the completeness of the policy, or the merits of any defenses to coverage that Liberty Mutual might assert. The December 6, 1999, Merchant letter does not create a genuine issue of material fact on Scotts' fraud claim.

J. Liberty Mutual's Position Regarding Coverage

Scotts also argues that Liberty Mutual representatives made fraudulent statements by denying the existence of coverage and policies.

> 28. Despite their conclusions at a May 8, 2000, internal meeting where Liberty Mutual personnel agreed that Liberty Mutual had insured Scotts under general liability policies and determined what year such coverage began (citing Kostecki Dep. pp. 84-85 [Scotts Ex. 87]; Yahia Dep. pp. 108-110 [Scotts Ex. 96]) at a subsequent meeting with Scotts on May 25, 2000, Liberty Mutual took the position that, because Scotts had not produced sufficient evidence of primary policies, Liberty Mutual would not provide coverage for Scotts' environmental claims. Armstrong Aff. ¶6, Ex. A-8 [Scotts Ex. 24].

> 30. During the 1998-2000 negotiations, Liberty Mutual told DRM that "they didn't believe that they issued policies for Scotts during the time period that we were interested in." Archangeli Dep. pp. 186-187 [Scotts Ex. 83].

> 37. During the entire course of Scotts' and DRM's discussions with Liberty Mutual, multiple Liberty Mutual

94

representatives continued to dispute having provided any
general liability or public liability coverage to Scotts.
Archangeli Dep. p. 479 [Scotts Ex. 83]; Armstrong Aff. Ex.
A-8 [Scotts Ex. 24] and A-26 [Scotts Ex. 23].

39. On November 21, 2006, Scotts' personnel met with
Liberty Mutual representatives, including Liberty Mutual's
in-house attorney Michael O'Malley. During a presentation
by Scotts of documents indicating that Liberty Mutual had
insured Scotts for multiple years before 1968, Mr.
Aronowitz, General Counsel for Scotts, intervened and
asked Mr. O'Malley if he was denying that Liberty Mutual
had insured Scotts prior to 1968. Even after reviewing
all the voluminous additional evidence presented by
Scotts, Mr. O'Malley replied that "we just don't know"
whether Scotts was an insured. Ivan Smith Decl. ¶4, Ex.
A-40 [Scotts Ex. 67]; David Aronowitz Decl. ¶4, Ex. A-41
[Scotts Ex. 68].

40. During many of the depositions taken in this action,
Liberty Mutual representatives questioned or disputed the
evidence that Liberty Mutual insured Scotts, that Liberty
Mutual had issued ten years of general liability and three
years of excess liability insurance to Scotts, and that
Liberty Mutual had issued other forms of coverage to
Scotts. Schlemmer Dep. pp. 68-69, 163 [Scotts Ex. 94];
Merchant Dep. pp. 206-208 [Scotts Ex. 89]; Prouty Dep. pp.
104, 147-149 [Scotts Ex. 93].

The above allegations are statements of Liberty Mutual's legal

position in regard to the sufficiency of evidence to establish the

existence of the alleged policies for purposes of the settlement

negotiations, not statements of fact. Further, as indicated

previously, there is evidence that coverage was not the issue in the

settlement negotiations. See Scotts Ex. 27, Yahia Dep. p. 111

("[N]o one wanted a determination of coverage, and it was an

analysis of the likelihood of proof of the policies."); Scotts Ex.

89, Merchant Dep. p. 255 (their conversations would have concerned

the policies, not the issue of coverage).

There is also no evidence from which a jury could find that

Scotts justifiably relied on the above statements. Scotts continued

to pursue a settlement with Liberty Mutual despite the above statements. Scotts had its own experts to assist it in evaluating the strengths and weaknesses of its position on whether Liberty Mutual had issued general liability or umbrella liability policies to Scotts during the relevant time period.

In addition, as Liberty Mutual argues, the representations were not material because, as discussed above, there is evidence that Liberty Mutual eventually conceded the existence of at least some policies for purposes of settlement only. See LM Tab 14 (Ms. Archangeli's phone log of a call to Robert Kostecki on June 5, 2000, stating that Liberty Mutual recognized "the 2 primary and two excess policies in the late 1960's."); LM Tab 16 (Ms. Archangeli's notes of a conversation with Mr. Merchant dated June 9, 2000, stating that "LM conceded 2 yrs." and "settlement offer based on 2 yrs. of cov."); LM Tab 13 (May 26, 2000, letter from Ms. Archangeli to Mr. Kostecki stating her understanding that Liberty Mutual's offer was based on "one liability and umbrella policy to Scotts from 1967-1968.").

In regard to paragraph 28, Liberty Mutual argues that the cited testimony of Ms. Yahia and Mr. Kostecki concerning the May 8, 2000, internal meeting at Liberty Mutual does not support the proposition that Liberty Mutual personnel agreed that Liberty Mutual had insured Scotts under general liability policies or determined the year coverage began. This court agrees. See discussion of paragraph 27 above; Scotts Ex. 27, Yahia Dep. pp. 108-111; LM Tab 39, Kostecki Dep. p. 85.

In regard to paragraph 39, Liberty Mutual denies that Mr. O'Malley ever made the statement that "we just don't know" whether Scotts was an insured. If it was made, it was made during a

settlement meeting held in 2006 in connection with the instant case. In that context, it is more in the nature of a statement of Liberty Mutual's position rather than a statement of fact. Although Scotts appears to take the position that the existence of the liability policies is incontrovertible, the evidence in the record would not preclude Liberty Mutual from taking a good faith position to the contrary. Liberty Mutual also correctly argues that the statement is inadmissible under Fed.R.Evid. 408 because it was made at a settlement meeting held after the instant action was filed. Rule 408 provides that statements made in compromise negotiations regarding a claim are not admissible when offered to prove liability for the claim. Fed.R.Evid. 408(a)(2). In addition, a jury could also not find that the statement was material or that Scotts relied upon it in negotiating the release because the statement was allegedly made on November 21, 2006, over six years after the release was signed.

As to paragraph 40, Liberty Mutual argues that the cited deposition testimony does not support the proposition that, in their depositions, Liberty Mutual representatives questioned or disputed evidence that Liberty Mutual had insured Scotts with ten years of general liability coverage, three years of excess liability coverage, and other forms of coverage. An examination of the cited testimony reveals that Mr. Schlemmer testified that he didn't recall whether anyone at Liberty Mutual ever acknowledged that Scotts was an insured, and stated that "we were not able to identify or find the policies and that Scotts also didn't have the actual policies." Scotts Ex. 94, Schlemmer Dep. pp. 68-69. He also testified that he did not recall whether Liberty Mutual ever made the determination that the evidence was not sufficient to acknowledge that Scotts was

97

an insured of Liberty Mutual.  Id. at p. 163.  The fact that he was
unable to recall whether anyone at Liberty Mutual acknowledged that
Scotts was an insured does not establish that anyone at Liberty
Mutual denied that Scotts was an insured.  The fact Scotts and
Liberty Mutual were unable to find any actual policies was a true
statement.

Mr. Merchant testified that he didn't recall if Ms. Yahia ever
acknowledged coverage.  Scotts Ex. 89, Merchant Dep. p. 206.  He
recalled that they had discussed that there were possibly two excess
and two general liability policies from 1966-1967 and 1967-1968, but
could not recall if Ms. Yahia or anyone else at Liberty Mutual ever
indicated that they had found evidence of other possible policies.
Id. at 207-208.  Again, the failure to recall whether anyone at
Liberty Mutual ever acknowledged coverage does not establish that
anyone denied coverage.

Mr. Prouty testified that he did not recall whether a loss
detail report with P numbers was ever provided to Scotts or DRM.  He
also testified that he told Ms. Archangeli that the P numbers were
Liberty Mutual claim numbers, but that he did not know what type of
liability policy the "P" referred to.  Scotts Ex. 93, Prouty Dep.
pp. 104, 147-149.  There is no evidence that these statements were
false.  This testimony does not support the proposition that someone
at Liberty Mutual denied the fact that Liberty Mutual had insured
Scotts; in fact, Prouty's testimony could be viewed as evidence to
the contrary.  Further, the matters at issue in the settlement went
far beyond whether Scotts had ever been an insured of Liberty
Mutual.  At issue was whether Scotts could establish that general or
umbrella liability policies were in effect during the relevant time
period, as well as the terms and conditions of those policies.

Even assuming that the testimony cited in paragraph 40 does constitute statements questioning or disputing whether Liberty Mutual insured Scotts, these deposition witnesses were not required to accept Scotts' position concerning the weight or value of the evidence offered by Scotts in attempting to prove that Liberty Mutual had issued liability policies to Scotts. The evidence in the record reveals that genuine issues of fact exist as to whether Scotts was an "insured" for purposes of the liability claims Scotts had tendered to Liberty Mutual. In addition, Liberty Mutual notes that the above deposition testimony was given over seven years after the negotiation of the settlement and release, in the context of the litigation in the instant case. Therefore, no jury could reasonably find that Scotts relied on this testimony in signing the release.

The above alleged statements of Liberty Mutual's position on the issue of coverage are not sufficient to raise a genuine issue of material fact as to Scotts' fraud claim.

K. Specimen Policies

Scotts contends that Liberty Mutual committed fraud by failing to provide specimen policies for the time period of the alleged coverage.

> 36. During the 1998-2000 negotiations, Brian Merchant told Diane Archangeli several times on the phone that Liberty Mutual was unable to provide specimen policies in this case. Several times, Liberty Mutual represented that specimen policies were not available. Archangeli Dep. pp. 301-302, 526-527 [Scotts Ex. 83].

Ms. Chartrand testified that Liberty Mutual has specimen policies going back to the 1950s and 1960s. Scotts Ex. 84, Chartrand Dep. p. 22. The record contains conflicting evidence as to whether Ms. Archangeli ever requested specimen policies in this case. There is no evidence that such a request was ever made in

99

writing.  Ms. Archangeli testified in her deposition that she asked
Mr. Merchant for specimen policies because she had gotten specimen
policies from Liberty Mutual in the past, and Liberty Mutual was
unable to provide them in this case.  Scotts Ex. 83, Archangeli Dep.
pp. 301-302.  She testified that she was told by "Liberty Mutual"
that specimen policies were not available.  Id. at 526-527.  Mr.
Merchant testified that at the time of the Scotts negotiations, he
was not familiar with the term "specimen policy" and that Ms.
Archangeli never asked him for specimen policies by that name.
Scotts Ex. 89, Merchant Dep. pp. 218-219.

Even assuming that Mr. Merchant or someone else at Liberty
Mutual told Ms. Archangeli that specimen policies were not available
in this case when in fact they were, Scotts must also point to
evidence sufficient to create a genuine issue of fact as to whether
the failure to reveal the specimen policies constituted a material
omission.  Scotts' documents which Ms. Archangeli submitted to
Liberty Mutual with her letter of October 5, 1998, included an
alleged Liberty Mutual umbrella excess policy printed on a Liberty
Mutual form with the printed date "1/3/63" in the lower left-hand
corner, and the dates "10/1/67-10/1/68" handwritten in the upper
right-hand corner.  See LM Tab E.  This document is similar in many
respects to the specimen policy contained in LM Tab 40, and it
appears on its face to be a standard printed form used by Liberty
Mutual for umbrella excess policies at that time.

In addition, Liberty Mutual points to Ms. Archangeli's
testimony that she was generally aware of the types of exclusions
that comprehensive general liability policies had in the '50s and
'60s.  Ms. Archangeli testified that she did not discuss the issue
of exclusions with Mr. Marsh, Scotts' insurance manager during the

1960s, because "I know what exclusions were, would have been [in] some policies back then." LM Tab 9, Archangeli Dep. p. 191. She also testified that she was generally aware of the types of exclusions that CGL policies had in the 1950s and 1060s when she was working on behalf of Scotts. Id. p. 192. Other documents prepared by Ms. Archangeli also indicate a familiarity with standard policy terms. See LM Tab 26, February 18, 1999, letter from Ms. Archangeli to Mr. Merchant (offering to settle the case "based upon the information gathered to date and certain assumptions about coverage limits and standard terms and conditions"); LM Tab 42 (Scotts settlement targeting spreadsheet which included discounts based on standard policy provisions). There is no evidence as to what additional information a specimen policy would have provided that Ms. Archangeli did not already know by reason of her experience and the umbrella excess policy documents which were already in Scotts' possession.

Noting the specimen jacket at LM Tab 40, Liberty Mutual also contends that specimen jackets are pre-printed forms containing standard policy provisions. They do not contain any information which would assist in determining the applicable limits of any policy, or whether any of the standard terms were amended by endorsement. Ms. Archangeli testified that insurance companies can reconstruct the terms and conditions of a policy by referring to specimen policies. Scotts Ex. 83, Archangeli Dep. p. 527; see also Scotts Ex. 52, Hendy Decl. ¶ 272 (stating that the first step in reconstructing policies is to see if specimen policies exist). However, Mr. Merchant observed that the umbrella excess policy in this case was missing the terms and conditions and the instruction page, which would list all of the endorsements and exclusions, and

101

reveal what jacket would apply to that particular policy.  Scotts
Ex. 89, Merchant Dep. pp. 219-222.  There is no evidence in the
record indicating that this type of information could be provided by
a specimen jacket, particularly since this information was not
included in the apparently standard policy form which accompanied
the umbrella excess policy in this case.

Scotts has not shown that the failure of Liberty Mutual to
provide specimen policies is sufficient to create a genuine issue of
fact in regard to Scotts' fraud claim.

L. Conclusion

Having reviewed the evidence cited by the parties, the court
concludes that no genuine issue of fact has been shown to exist in
regard to Scotts' fraud claim, and that Liberty Mutual is entitled
to summary judgment on that claim.

VII. Count Six - Rescission

In Count Six, Scotts asserts the right to rescind the Release
due to fraud, breach of fiduciary duty, and mutual mistake.  As
discussed above, Scotts has failed to show the existence of a
genuine issue of material fact sufficient to avoid summary judgment
on the breach of fiduciary duty and fraud claims.  Therefore, these
claims cannot constitute the basis for the remedy of rescission.
However, Scotts also contends that the Release should be set aside
due to mutual mistake.

"A release may be avoided where the releasor can establish by
clear and convincing evidence that the release was executed by
mutual mistake as between himself and the releasee, of a past or
present fact material to the release, such as the existence of any
injury to the releasor, unless it appears that the parties intended
that claims for all injuries, whether known or unknown at the time

of the execution of the release, be relinquished." _Sloan v._ _Standard Oil_, 177 Ohio St. 149, syllabus para. 1, 203 N.E.2d 237 (1964)(emphasis in original). _See also_ _Pizzino_, 93 Ohio App.3d at 252 (mutual mistake as to the full extent of the releasor's injuries is a defense to a release if the parties did not intend to relinquish all future claims). A mutual mistake requires a mistake made by both parties regarding the same fact. _Reilley v. Richards_, 69 Ohio St.3d 352, 353, 632 N.E.2d 507 (1994). "A mistake is material to a contract when it is 'a mistake *** as to the basic assumption on which the contract was made that has a material effect on the agreed exchange of performances.'" _Id_. (quoting 1 Restatement of the Law 2d, Contracts 385, Mistake, Section 152(1) (1981)).

A release is a contract enforceable at law subject to the rules governing the construction of contracts. _Noroski v. Fallet_, 2 Ohio St.3d 77, 79, 442 N.E.2d 1302 (1982). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." _Kelly v. Med. Life Ins. Co._, 31 Ohio St.3d 130, syllabus para. 1, 509 N.E.2d 411 (1987). Factors to consider in determining whether the parties intended that all claims for all injuries be relinquished include: (1) the presence or absence of bargaining and negotiating leading to settlement; (2) was the releasee clearly liable: (3) was there discussion concerning the alleged injuries; (4) is the claim that the injuries were in fact unknown at the time of the execution of the release reasonable; (5) was the amount of consideration received reasonable compared with the risk of the existence of unknown injuries; (6) the presence or absence of haste by the releasee in securing the release; and (7) did the release specifically include or exclude the injuries alleged. _Sloan_, 177 Ohio St. at 153.

Although Scotts pleaded mistake in its amended complaint only in general terms, Scotts now argues that, at the time of the Release, both parties were mistaken as to the existence of newly discovered secondary evidence which allegedly supports the existence of liability coverage. There is evidence that both parties were unaware of the information contained in the 2007 loss run at the time of the settlement (although Scotts inconsistently argues in regard to its fraud claim that Liberty Mutual deliberately concealed this information). However, as discussed in the section on the fraud claim, pp. 58-65, the information which was provided to Scotts after the negotiation of the settlement agreement, such as the 2007 loss run and portions of the 2006 loss run, was merely cumulative of information the parties already possessed at the time of the settlement, and a jury could not reasonably find, based on the evidence, that this information was material to the Release so as to satisfy the requirements for rescinding the Release due to mutual mistake.

In addition, the evidence indicates that the parties intended to relinquish all future claims, whether known or unknown. The record indicates that there were negotiations between the parties prior to the execution of the Release which spanned over eighteen months. There was a significant dispute concerning the existence, terms and conditions of the alleged liability insurance policies, particularly since neither party could locate complete copies of the actual policies. Liberty Mutual was still searching for records of policies issued to Scotts, but Scotts chose to accept Liberty Mutual's offer and enter into the settlement before the search was completed. Based on the evidence, the amount of consideration paid by Liberty Mutual under the terms of the Release was reasonable,

104

considering that the existence and amounts of coverage were in doubt, and that Liberty Mutual intended to assert a variety of defenses to the submitted claims, including untimeliness.

The unambiguous language of the Release indicates that the parties intended for the Release to apply to all "past, present and future claims ... of any kind, nature and description whatsoever, whether known or unknown, asserted or unasserted, which have ever been or which may in the future be made by any Person or entity seeking any relief of any kind, nature and description whatsoever." Doc. No. 167, Francisco Decl., Ex. BB, Release, Sections I.D.; IV. The Release also applies to "any and all general liability insurance policies, contracts or agreements" issued by Liberty Mutual to Scotts or ITT prior to the date of the Release. Release, Section I.A. The Release further contains a stipulation by the parties that "all of the available bodily injury, personal injury, and property damage aggregate limits, and/or any other aggregate limits contained in or any available coverage under each of the Policies issued or allegedly issued are exhausted in full and complete satisfaction of any and all obligations of any nature whatsoever of Liberty." Release, Section VI.

In addition, Ohio courts have adopted the Restatement test which provides that a contract is not voidable by the adversely affected party due to mutual mistake if he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient. See Reilley, 69 Ohio St.3d at 353; J.A. Industries, Inc. v. All American Plastics, Inc., 133 Ohio App.3d 76, 85, 726 N.E.2d 1066 (1999) (citing 1 Restatement of the Law 2d, Contracts 385, Sections 152(a), 154(b), 402-403).

105

The use of the term "allegedly issued" in the Release refers to the policies which Scotts thought might have existed in light of the information from Wassau and the list of claims numbers.  The term "allegedly issued" indicates that the parties were aware that the existence of the policies was in dispute, and that the parties intended that any doubts about the existence of the policies be resolved by the Release.  In her letter of February 18, 1999, to Mr. Merchant, Ms. Archangeli described the PowerPoint presentation which DRM wished to present to Liberty Mutual, including an "[o]ffer to settle the case based upon the information gathered to date and certain assumptions about coverage limits and standard terms and conditions."  LM Tab 26.  Further, in her May 18, 1999, letter from Ms. Archangeli to Mr. Merchant, Ms. Archangeli stated,

> Scotts is content to negotiate a settlement based upon the policy information that is available at this point in time.  It seems unlikely to us that after nine months of looking for these policies, Liberty Mutual will turn up any new policy information.  Therefore, rather than delay negotiations while you continue to look for policies, we propose again that we try to negotiate a resolution to Scotts' environmental claims based on the facts as we know them today.

LM Tab 27.  There is also evidence that despite the fact that in early June of 2000, Ms. Armstrong had asked Mr. Kostecki of Liberty Mutual to do another policy search, see LM Tab 28, on June 13, 2000, before the completion of the second Phase II search, Ms. Armstrong recommended that Scotts accept the settlement offer.  LM Tab 43.

The evidence establishes that both parties were aware during their negotiations that the actual insurance policies could not be located, and that the existence of the policies and their terms were in dispute.  The evidence further shows that despite being aware of this lack of evidence, Scotts chose to negotiate a settlement of any

106

and all past, present and future claims based on the information which it had at that time. By accepting the settlement offer, Scotts knowingly bore the risk of the possibility that additional evidence of coverage would be discovered in the future. See J.A. Industries, 133 Ohio App.3d at 85.

Scotts has failed to produce evidence from which a jury could reasonably find that the Release should be rescinded due to mutual mistake.

Scotts has failed to produce evidence from which a jury could reasonably conclude that the Settlement and Release is invalid or subject to rescission due to fraud, breach of fiduciary duty, or mutual mistake, or to raise a genuine issue of fact in that regard. As a result, Scotts' claims of breach of contract and of the implied covenant of good faith are barred by the Release.

VIII. Conclusion

In accordance with the foregoing, Liberty Mutual's motion for summary judgment (Doc. No. 165) is granted. Liberty Mutual is entitled to summary judgment on the claims of breach of fiduciary duty (Count One) and fraud (Count Two). Liberty Mutual is also entitled to summary judgment on Count Six, which seeks the remedy of rescission of the Release. Since this ruling upholds the validity of the Settlement and Release, and since the Release bars the claims of breach of contract and of the implied covenant of good faith in Counts Three and Four, Liberty Mutual is also entitled to summary judgment on Counts Three and Four of the first amended complaint.

Since Liberty Mutual has been awarded summary judgment on the issue of the validity of the Settlement and Release, Scotts' motion for partial summary judgment on Counts Three and Four of the first amended complaint is moot. Further, upon review of the extensive

107

record, the court concludes that genuine issues of material fact exist as to whether Scotts can prove the existence and terms of the alleged general liability policies upon which the claims in Counts Three and Four are based.  An award of summary judgment in Scotts' favor on those claims would not be appropriate.  Accordingly, Scotts' motion for partial summary judgment (Doc. No. 170) is denied.

In light of the above rulings, Liberty Mutual's motion to bifurcate Counts Three and Four (Doc. No. 195) is moot.  The motion to intervene of ITT Corporation (Doc. No. 203) is moot.  Liberty Mutual's motion for sanctions (Doc. No. 166) is denied without prejudice to being renewed following the disposition of the bad faith claim in Count Five.  If Liberty Mutual wishes to renew this motion, the parties may add any new evidence or argument they wish to bring to the court's attention.  However, the court will also consider the pleadings which have already been filed on this issue if they are incorporated by reference; the parties should not re-file evidence or information which is in the record.  The court notes that, although they were tendered to the court for filing, the hard copy binders entitled "Liberty Mutual's Supplemental Submission in Support of Its Motion for Summary Judgment" and "Liberty Mutual's Submission of Documents Referenced During the May 2, 2008 Hearing on Liberty Mutual's Motion for Summary Judgment" have not yet been filed.  The clerk is directed to note the filing of these hard copy documents on the record.  The stay as to Count Five is lifted, and the case is referred to the Magistrate Judge to conduct a status conference and, if necessary, enter a scheduling order governing the proceedings in Count Five.

Date: March 26, 2009          s/James L. Graham
                              James L. Graham
                              United States District Judge